[Cite as *In re G.P.*, 2017-Ohio-2883.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

IN THE MATTER OF: G.P.

                                        :
                                        :
   :     Appellate Case No. 2016-CA-88
   :
   :     Trial Court Case No. 2015-1350
   :
   :     (Appeal from Domestic Relations
   :     Court)
   :
   :

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of May, 2017.

. . . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Assistant Clark County Prosecutor, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
     Attorney for Appellee

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 130 West Second Street, Suite 2103, Dayton, Ohio 45402
     Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Appellant, A.P., appeals from a judgment terminating her parental rights over her minor son, G.P., and awarding permanent custody of G.P. to Appellee, Family and Children Services of Clark County (FCSCC).[1]  In support of her appeal, Mother contends that the trial court's delay in appointing counsel prejudiced her ability to protect her parental rights.   Mother further contends that the trial court erred in finding that an award of permanent custody was in G.P.'s best interests.

**{¶ 2}** After reviewing the record, we find no merit in Mother's arguments.   Mother waived any error regarding the appointment of legal counsel by failing to either request a continuance or object to any alleged error during the trial court proceedings.   Furthermore, under a plain error standard, no extraordinary circumstances existed to require reversal.   Counsel was appointed well in advance of the permanent custody hearing, and Mother failed to show how she was prejudiced.   The trial court also did not err in finding that an award of permanent custody was in the child's best interests.   The court's decision was supported by clear and convincing evidence.   Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

**{¶ 3}** G.P. was born in January 2014.   Within a day of G.P.'s birth, FCSCC received a referral regarding animal feces in Mother's apartment and concern about Mother's ability to parent her newborn son, based on Mother's cognitive delay.   When

---

[1] For purposes of clarity, we will refer to A.P. as "Mother."   We will also refer to the child's father, D.C., as "Father."   Father surrendered his parental rights at the permanent custody hearing, and has not appealed.

Mother left the hospital with G.P., she agreed that she and G.P. would stay with her mother, O.P. However, within the week, Mother went to stay with her sister, D.H. ("Sister") because O.P. was not properly supervising Mother and was allowing Mother to take the baby to her boyfriend's house.

{¶ 4} On February 19, 2014, FCSCC filed a complaint for temporary custody in Clark County Common Pleas Court, Domestic Relations Division, Juvenile Section. The case was designated as Case No. 20140198. In the complaint, FCSCC alleged that G.P. was dependent, and moved for emergency shelter care and temporary custody of G.P. On March 7, 2014, the parties agreed that Sister would have temporary legal custody of G.P. Mother then moved to Waverly, Ohio with her boyfriend, Chris, and his mother, Rita, in April 2014. Chris was not G.P.'s father. Mother was allowed visitation in Sister's home every Saturday from 12:00 to 4:00 p.m., but her visitation was inconsistent due to transportation issues and Mother's illness.

{¶ 5} In August 2014, FCSCC filed a complaint for emergency shelter care based on continuing concerns over gross conditions, cleanliness, and safety in Sister's home. Following an emergency shelter care removal on August 4, 2014, G.P. was placed in foster care with licensed foster care parents. The court then granted FCSCC temporary custody of G.P. on September 10, 2014. Mother's counsel signed the order granting temporary custody to FCSCC.

{¶ 6} In February 2015, Father filed a motion for custody of G.P. Father had been working on a case plan with FCSCC since July 2014. On March 28, 2015, an agreed entry was filed, granting legal custody of G.P. to Father, and allowing Mother reasonable visitation as agreed upon by the parties. Again, Mother was represented by counsel,

and agreed to the entry. G.P. was then removed from the foster parents and placed with father. FCSCC closed its case on April 27, 2015.

{¶ 7} When Father was given custody, FCSCC's decision was based on the fact that Father was living with his own mother, who would assist with G.P.'s care and provide stable housing, food, and supervision of G.P. However, that did not turn out to be the case. Instead, when Father obtained custody, he was living with a known prostitute, there was domestic violence in the home, and Father's own mother was not truly staying in the home; she was staying with her boyfriend, who was a registered sex offender. Further, the registered sex offender would also stay at times in Father's home.

{¶ 8} A case was opened briefly in FCSCC's Alternative Response ("AR") unit for about three weeks in June and July 2015, based on a report that Father's mother was verbally and physically abusive with G.P. FCSCC provided services, and the case was closed on July 9, 2015. More referrals were received, and FCSCC opened another AR case on November 11, 2015. At that point, Father's girlfriend, Courtney, brought G.P. to the hospital, due to concerns that G.P. had been sexually abused.

{¶ 9} Previously, in June 2015, FCSCC had filed a complaint seeking an emergency shelter care order for Courtney's own two-day old child, E.C. The complaint noted that Courtney's older child had been in foster care since August 2014, and FCSCC was seeking permanent custody of that child. In addition, the complaint alleged that Courtney was using drugs and had reported that she was prostituting to support her habit. Courtney also alleged that Father (D.C.) was E.C.'s father.

{¶ 10} At the hospital emergency room, Courtney claimed she was G.P.'s mother. A referral was made to FCSCC at that point, because no one who presented at the

emergency room was very clean, and there were concerns over whether G.P. was being cared for appropriately. Subsequently, on December 28, 2015, FCSCC received a police referral. A domestic violence or domestic altercation had occurred between Father and Courtney. The police report described the house as being in deplorable condition, with lots of animal feces on the floor that G.P. could access. In addition, the home had little food. G.P. was removed, and Father was charged with child endangering on December 29, 2015. FCSCC then filed a new complaint for emergency shelter care on December 29, 2015. This case was designated as Case No. 20151350. At that time, G.P. was placed with the foster parents who had previously cared for him. The court also appointed a guardian ad litem ("GAL") for G.P. on December 29, 2015.

{¶ 11} The initial summons and dependency complaint was sent to Mother on January 5, 2016. The summons informed Mother of the hearing date on January 19, 2016, and further informed her that she had a right to a lawyer. In addition, the summons stated that the court would appoint a lawyer if litigants could not afford one and met certain requirements. The summons also specifically listed the phone number for a court employee who had been designated as the person who would arrange for prompt appointment of counsel. Doc. #6, p.1.

{¶ 12} Mother signed for the summons on January 13, 2016. On January 19, 2016, the trial court filed a judgment entry finding G.P. dependent and awarding temporary custody to FCSCC. Both Mother and Father signed the judgment entry, and no appeals were taken from this judgment.

{¶ 13} On March 3, 2016, the trial court filed a letter it had received from Mother, asking for legal representation. The docket states that the court denied the request and

told Mother she needed to pay a $25 fee and fill out a financial affidavit.

{¶ 14} A Semi-Annual Administrative Review ("SAR") was held in May 2016. At that time, reunification was still planned, and the agency was working with the parents. The SAR noted that Mother had stable housing and utilities, but that her housing was not an appropriate place for G.P.

{¶ 15} In July 2016, the trial court appointed counsel for Father after he paid a $25 fee and filed an affidavit of indigency. Subsequently, on August 2, 2016, FCSCC filed a motion to modify temporary custody to permanent custody. FCSCC noted in the motion that G.P. had been in the agency's custody for 12 of 22 consecutive months, and that G.P. could not and should not be placed with either parent within a reasonable time.

{¶ 16} The summons issued to Mother informed her that she was required to appear before the court on September 12, 2016, and again informed Mother that she was entitled to have the court appoint counsel for her. As before, the summons directed Mother to the court employee the court had designated to arrange for appointment of counsel. Doc. #31, p.1.

{¶ 17} The parties appeared as requested on September 12, 2016, and the court set a mediation for September 28, 2016, and a trial for November 7, 2016. Amanda, the FCSCC caseworker, discussed with Mother the fact that they were getting close to mediation and Mother did not have an attorney. Amanda was aware that Mother had used her Social Security money to pay court fines for her current fiancé (Marcus), and they discussed how Mother was going to pay the $25 fee to obtain an attorney. Transcript of Proceedings, p. 96. On September 15, 2016, Mother filed an affidavit of indigency, and the court appointed counsel for Mother the dame day.

{¶ 18} The mediation did not resolve any issues, and the permanent custody hearing took place on November 7, 2016, as scheduled. The GAL filed a report the day of trial, recommending that the court grant permanent custody to FCSCC.

{¶ 19} At the custody hearing, Father appeared and surrendered his rights to G.P. FCSCC then presented testimony from the following people: the Visitation Program Coordinator for the Clark County Department of Job and Family Services; G.P.'s foster father; and the FCSCC caseworker. The trial court also admitted several FCSCC exhibits, including certified copies of the former juvenile cases involving Mother and Father, and Father and Courtney. In response, Mother testified on her own behalf. The testimony at the hearing revealed the following facts.

{¶ 20} When FCSCC reopened G.P.'s case in December 2015, the agency learned that Mother also had an open case with the children services agency in Ross County, Ohio, where Mother currently lived. This case involved mother's second son, R.P., who was born in late August 2015. This child had been removed for reasons similar to those causing G.P.'s removal: cleanliness of the home; issues about Mother's cognitive abilities to care for the child; and concerns over the child's general safety and supervision.

{¶ 21} As part of the case plan (which was filed in March 2016), FCSCC asked Mother to remain compliant with the Ross County case, and to obtain stable, safe, and appropriate housing. In addition, FCSCC asked mother to follow through with mental health, keep her benefits up to date, meet her own basic needs, and have regular, scheduled visits with G.P.[2] By the time of the final hearing in November 2016, Mother

---

[2] Mother was 27 years old at the time of the hearing and had received Social Security benefits since she was 12. Mother did not know why she received benefits. She had also been informed that her benefits were to be terminated in December 2016 if she did

had made no progress on her case plan. For clients on case plans, FCSCC makes referrals for transportation, financial assistance, counseling, parenting classes, and anything else the agency can do for the client's benefit. Team visits and home visits are mandated to happen once a month. Amanda, the FCSCC caseworker, indicated that she visited Mother as Mother requested, and would sometimes go twice a month. Whenever Mother did not understand something, Amanda spoke to her in person to try and get things accomplished.

{¶ 22} According to Amanda, Mother never had clean or stable housing. When Mother lived in Ross County, the homes where she lived had cockroaches or mold on food and dishes, animal waste in the home, and cigarette butts all over the floor.

{¶ 23} Mother returned to Clark County in late August 2016 (after having been beaten by her then-fiancé, Chris) and moved in with her uncle. However, by Mother's own report to FCSCC, her uncle's house was a drug house and prostitutes were coming in and out. About a week and a half before the permanent custody hearing (which was on November 7, 2016), Mother and her new fiancé, Marcus, began living with Marcus's mother, Michelle, and Michelle's boyfriend. The apartment in which they were living was a one-bedroom apartment. Michelle and her boyfriend shared the bedroom, Marcus slept on the couch, and Mother slept in a recliner. No one in the house had full-time employment. Marcus had a prior criminal history, including felony abduction, felony disruption of public service, and a felony domestic violence charge that had been reduced to a misdemeanor. His prior girlfriend and their three children had also obtained a

---

not furnish identification. Mother had no appropriate identification because her former fiancé, Chris, had taken it.

protection order against him.

{¶ 24} FCSCC caseworker, Amanda, testified that when she picked Mother up to take her to visitation on November 4, 2016, there was a strong smell on the premises of animal waste, body odor, and, generally, not a good smell. Hygiene had been a problem throughout the case.

{¶ 25} Amanda was also concerned that Mother had virtually no contact with G.P. As was noted, Mother moved away from the area in April 2014, when G.P. was about four months old. Amanda indicated that during the first time the foster parents had G.P. – from August 2014 until March 20, 2015 – Mother visited on or around October 1, 2014, and on January 27, 2015. After that, the records did not show any more visits until March 22, 2016, when Mother had her orientation at the Visitation Center.[3] No more visits occurred thereafter until November 4, 2016.

{¶ 26} The coordinator for the Visitation Center contacted Mother in January 2016 to schedule visitation. Mother said she would have to check her schedule, and he did not hear from her for two months. As noted, Mother's first visit was on March 22, 2016. The coordinator made several phone calls to Mother, and visitation was eventually placed on hold due to no-shows.

{¶ 27} Because Mother did not live in the area, transportation was a problem. Mother's then-fiancé, Chris, had a vehicle, but Mother reported that traveling back and forth from Chillicothe cost $40. FCSCC offered Mother gas cards, but Mother did not fill

---

[3] As was noted, Father had legal custody of G.P. between March 20, 2015 and December 29, 2015. The record is unclear as to whether Mother visited G.P. at all during this time. Mother claimed she had tried to visit G.P., but that Father had cancelled visits. Mother did not state that she had seen G.P. at all during this nine-month period.

out the forms to obtain them. In order to facilitate the March 22, 2016 visit, the caseworker gave Mother an emergency gas card.

{¶ 28} Although Mother claimed consistently that she lacked financial means to get to Springfield, Mother had the money to make a trip to Michigan. In June 2016, Mother called the caseworker, Amanda, and said that she was possibly in legal trouble. Specifically, Mother and her fiancé, Chris, had gone to Michigan to meet someone Mother had met online. They then brought this person, who was 21 years old, back to their home in Ohio. The woman lived in a group home and was a ward of the State of Michigan. She was in a group home because she was not able, cognitively, to care for herself. After Mother, her fiancé, and the woman had a "threesome," Mother's fiancé was going to have sexual relations with just the other woman. Mother became upset and got into a physical altercation with the other woman. When the police were called, the woman reported that she had been assaulted and raped by Mother and her fiancé. Mother told Amanda that she was afraid charges were going to be filed against her.

{¶ 29} To help Mother, Amanda spoke to her supervisor and to the attorney who represented FCSCC. They then contacted the Ross County prosecutor to explain the severity of Mother's cognitive difficulties. Ultimately, no charges were filed. During her testimony, Mother agreed this account of the situation was pretty accurate.

{¶ 30} In July 2016, Mother gave birth to a third child, a daughter, without knowing she was pregnant. At the time of the hearing in November 2016, this child was in a hospital in Columbus, Ohio, where she had been since birth. The child was on a feeding tube, was not able to breathe on her own, and did not show much brain activity. Mother had seen this child only once, and Ross County had custody of the child.

{¶ 31} In August 2016, Mother's fiancé, Chris, assaulted her and broke several of her ribs. Mother testified that she decided to return to Springfield because she had nowhere else to live. According to the Visitation Coordinator, when Mother was getting ready to move back to Springfield in late August 2016, she was adamant that there would be no transportation problems in terms of getting to visits. Visits were reinstated at the beginning of October, and Mother missed the first two visits. Mother testified that she called an hour after visitation about one of the visits, when she could not make it to the visit. Mother did not call about the other visit, nor did she show up for it. Her reason why, in her words, was that "I wasn't in town at that time, and it slipped my mind until the last minute." Transcript of Proceedings, p. 127.

{¶ 32} As was noted, the next visit was on November 4, 2016, a few days before the permanent custody hearing. During that visit, Mother and the caseworker, Amanda, were standing near a gate to the visitation room. G.P. got really excited and was smiling, but when the gate was opened, he ran straight to Amanda, not to his mother. Amanda, Mother, and the Visitation Coordinator (who was present for most of the visit), agreed that G.P. did not appear to know who Mother was.

{¶ 33} The testimony also clearly indicated that Mother had problems with people taking advantage of her Social Security money, and spent her money on others' needs while failing to ensure that her own basic needs were met. As just one example, Mother paid court fines for her fiancé (Marcus). At the same time, a bench warrant existed for Mother's arrest in Ross County because she had failed to pay a fine on her own criminal case. Another example is that while Mother lived with her prior fiancé, Chris, his mother had taken control of Mother's money, and when Mother asked about it, claimed it had

been stolen.   In reality, Chris's mother was using the funds for her own expenses.

{¶ 34} At the hearing, Mother testified that she could provide a loving and stable home for G.P., and could give him what he needed.   She stated that if FCSCC would continue working with her, she would do what she needed regarding housing and mental health, and would not mind going back through parenting classes.

{¶ 35} Finally, the FCSCC caseworker testified that G.P. could not reunify with either parent because neither was stable enough to reunify, neither had stable housing, and neither was cognitively able to meet the basic needs of a child because they could not provide for their own basic needs.   G.P. had not bonded with Mother, and was very deeply bonded with his foster family.   The caseworker also indicated G.P. was adoptable and was very sweet and loving.   G.P.'s foster father also testified about how well G.P. had done while in their family home for 18 months, and how G.P. was treated as a member of the foster family and its extended family.

{¶ 36} After the testimony concluded, the GAL indicated that her recommendation of permanent custody to FCSCC had not changed.   Subsequently, on November 15, 2016, the court filed a judgment entry finding that it was in G.P.'s best interest to award permanent custody to FCSCC.   Mother timely appealed from the trial court's decision. As was noted, Father did not appeal.


II.   Alleged Delay in Appointing Counsel

{¶ 37} Mother's First Assignment of Error states that:

> The Trial Court's Delay in Appointing Counsel Prejudiced Mother's
>
> Ability to Protect her Statutory, Due Process and Equal Protection Rights.

**{¶ 38}** Under this assignment of error, Mother contends that R.C. 2151.352 and Juv.R. 4(A) guarantee parents the right to counsel at all stages of the proceedings, and that the trial court's failure to appoint counsel on March 3, 2016, deprived mother of the ability to protect her rights. In response, the FCSCC notes that the trial court properly filed an entry on March 10, 2016, denying Mother's request until she paid the $25 application fee and filed an affidavit of indigency. FCSCC also argues that Mother failed to show how she was prejudiced, particularly since the failure to obtain counsel was her own fault.

**{¶ 39}** The docket sheet in this case states that the trial court denied the request for a court-appointed lawyer, and further stated that Mother must pay a $25 fee and file a financial affidavit. However, no documents appear in the file other than the notation on the docket sheet. Assuming for the sake of argument that the trial court denied the motion, we find no error that prejudiced Mother.

**{¶ 40}** As an initial matter, we note that counsel was, in fact, appointed in September 2016, almost two months prior to the permanent custody hearing. Mother did not bring any error or delay in appointing counsel to the trial court's attention. Specifically, Mother did not ask for a continuance of the hearing set for November 7, 2016, nor did she object during the hearing.

**{¶ 41}** " 'Ordinarily, errors which arise during the course of a trial, which are not brought to the attention of the court by objection or otherwise, are waived and may not be raised upon appeal.' " *In re Johnson*, 10th Dist. Franklin Nos. 03AP-1264, 03AP-1265, 2004-Ohio-3886, ¶ 14, quoting *Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Standards and Bldg. Appeals*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). (Other

citations omitted.) *See also In re J.D.*, 2d Dist. Montgomery No. 26588, 2015-Ohio-4114, ¶ 73.

**{¶ 42}** In such situations, we review only for plain error. *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, ¶ 15. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus. After reviewing the record, we find no such exceptional circumstances.

**{¶ 43}** The Supreme Court of Ohio has stressed that "[a] parent's relationship with his or her child is among the 'associational rights' sheltered by the Fourteenth Amendment to the United States Constitution against unwarranted usurpation, disregard, or disrespect by the state." (Citation omitted.) *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17. Thus, "[i]n actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel and a transcript at public expense for appeals as of right." *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6, 399 N.E.2d 66 (1980), paragraph two of the syllabus.

**{¶ 44}** Consistent with these rights, R.C. 2151.352 statutorily provides that various parties, including parents, are "entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code." The statute

further provides, in pertinent part, that:

> If, as an indigent person, a party is unable to employ counsel, the party is entitled to have counsel provided for the person pursuant to Chapter 120. of the Revised Code * * *.  If a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person.

{¶ 45} Juv.R. 4(A) also indicates that parties have the right to be represented by counsel if they are indigent.   And finally, R.C. 120.36(A) provides for a filing fee of $25.00 to be paid for appointed counsel at the same time a party files an affidavit of indigency or a financial disclosure form with the court.

{¶ 46} The record indicates that Mother appeared before the court on several occasions:   January 19, 2016; September 12, 2016; and November 7, 2016.   SARs were also held in February and May 2016, but Mother failed to appear for these proceedings.   In January 2016, the parties agreed that G.P. was dependent and that FCSCC would have temporary custody.   No appeals were taken from this judgment.

{¶ 47} The trial court would have had an opportunity to inquire about Mother's lack of counsel at any hearings.   However, the record does not contain transcripts from any hearings other than the hearing on November 7, 2016.   In the absence of transcripts, we presume the regularity of the proceedings.   *See, e.g., Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980); *In re J.B.*, 10th Dist. Franklin No. 07AP-242, 2007-Ohio-6088, ¶ 9.[4]

---

[4] Notably, the Supreme Court of Ohio has held that "[t]here is no constitutional

{¶ 48} Mother was well aware of her right to counsel, as she had been represented by counsel in the prior juvenile proceeding. More importantly, the court's initial summons to Mother, which was issued on January 5, 2016, informed Mother of her right to counsel and gave her the phone number of the court employee who could arrange for prompt appointment of counsel for indigent persons. Instead of contacting that individual as directed, Mother sent a letter to the court.

{¶ 49} Even if we assume that the trial court incorrectly denied Mother's initial request for counsel, the trial court did not commit prejudicial error, because it did, in fact, appoint counsel to represent Mother. From this perspective, we stress that Mother's contention is not that she was denied counsel; she claims she was prejudiced because counsel was not appointed quickly enough. Again, Mother could have filed a motion to continue the hearing on November 7, 2016, if she felt she needed additional time.

{¶ 50} Moreover, Mother fails to suggest what more counsel could have done to

---

requirement that appellant be afforded counsel at temporary custody proceedings." *In re Miller*, 12 Ohio St.3d 40, 41, 465 N.E.2d 397 (1984). A statutory right in such cases does exist under R.C. 2151.352 and Juv.R. 4. *State ex rel. Asberry v. Payne*, 82 Ohio St.3d 44, 693 N.E.2d 794 (1998). However, lack of counsel at temporary custody proceedings has been held irrelevant to appeals of parental termination where counsel was ultimately appointed to the proceeding that terminated parental rights. *See In re Moore*, 9th Dist. Summit No. 19217, 1999 WL 1215294, *5 (Dec. 15, 1999). The Supreme Court of Ohio has also held that adjudications of neglect or dependency followed by disposition of temporary custody to an agency are final appealable orders and issues pertaining to temporary orders cannot be considered in a later appeal of permanent custody decisions. *See In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 10-17; *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), syllabus. As a result, even if the trial court had erred in failing to appoint counsel in connection with the original adjudication of temporary custody (a fact that is not apparent in this record), that issue would not be properly before us. It would also be irrelevant to the issue before us, which involves the grant of permanent custody. *Id. See also In re S.B.*, 8th Dist. Cuyahoga Nos. 101159, 101160, 2014-Ohio-4839, ¶ 19 (refusing, under *H.F.*, to address assignment of error relating to trial court's failure to follow Juv.R. 29 during adjudicatory hearing on dependency).

assist her. The record demonstrates that over the course of more than two years, Mother did nothing to comply with the case plan or to attempt to reunify with her child. Mother was so disinterested in G.P.'s welfare that she moved more than a hundred miles away to be with her boyfriend when G.P. was less than four months old. Even after Mother returned to the area more than two years later, she missed the first two visitations that were scheduled. At that point, she had not seen G.P. for more than seven months. On one of these scheduled visits, the visitation "slipped" her mind. Given this level of indifference to G.P., there is little counsel could have done. We note that counsel filed a motion for discovery prior to the hearing and also defended Mother at the hearing. There is no indication that counsel failed to do what was needed to assist Mother, and no extraordinary circumstances occurred that would justify reversal. Accordingly, the First Assignment of Error is overruled.

### III. Was Permanent Custody in the Child's Best Interests?

{¶ 51} Mother's Second Assignment of Error states that:

The Trial Court Erred in Finding, by Clear and Convincing Evidence, That an Award of Permanent Custody Was in the Best Interests of the Child.

{¶ 52} Under this assignment of error, Mother contends that FCSCC failed to demonstrate that it made reasonable efforts to reunify her with G.P. In this regard, Mother argues that the transportation requirements placed an undue burden on her and that she should have been allowed time to comply with her case plan once she returned to Springfield.

{¶ 53} "R.C. 2151.414 establishes a two-part test for courts to apply when

determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8, citing R.C. 2151.414(B)(1). *Accord In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14; *In re K.L.,* 2d Dist. Greene No. 2014-CA-31, 2014-Ohio-5576, ¶ 6.

{¶ 54} There was no dispute in this case that G.P. had been in the custody of the agency for 12 or more months of a consecutive 22-month period as described in R.C. 2151.413(D)(1). As a result, the trial court was entitled to award FCSCC permanent custody if it found "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody * * *." R.C. 2151.414(B)(1). The court did not have to consider " 'whether the child can be placed with either parent within a reasonable time or should not be placed with the child's parents, as would be required under R.C. 2151.414(B)(1)(a).' " (Citation omitted.) *In re S.H.*, 2d Dist. Montgomery Nos. 24619, 24644, 2011-Ohio-4721, ¶ 6. *Accord K.L.* at ¶ 7, fn. 2, citing *S.H.* at ¶ 6.

{¶ 55} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty

as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 56} The best interest factors under R.C. 2151.414(D) include, but are not limited to: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, at ¶ 15.

{¶ 57} In concluding that permanent custody was in G.P.'s best interest, the trial court cited the following reasons: (1) the reasonable probability G.P. could be adopted; (2) G.P.'s lack of regular contact with his biological family; (3) the absence of any probability that the parents could provide a safe, secure, and appropriate home for G.P. any time soon; (4) the GAL's recommendation that the agency be granted permanent custody; (5) the parents' failure to remedy the conditions that caused G.P.'s removal; (6) the lack of interested relatives who could care for G.P.; (6) the child's wishes as expressed by the GAL; and (7) the fact that "no safe, appropriate, harmonious, and loving relationship" existed between G.P. and his parents or extended family. Judgment Entry,

Doc. #51, pp. 5-6.

{¶ 58} The trial court's decision is well-supported by clear and convincing evidence. Mother's assertion about the transportation burden is unconvincing when one considers that Mother voluntarily moved a great distance away from her child for reasons completely unrelated to the child or his welfare. Furthermore, FCSCC was willing to provide Mother with gas cards, but Mother failed to fill out forms to obtain them. When Mother moved back to the area, she missed the first two scheduled visitations for no apparent reason.

{¶ 59} In *K.L.*, we recognized that abandonment, even if not a required finding, remains "a relevant best-interest consideration." (Citations omitted.) *K.L.*, 2d Dist. Greene No. 2014-CA-31, 2014-Ohio-5576, at ¶ 15. R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 60} In discussing Mother's situation, the trial court noted that she "repeatedly went for more than 90 days without having contact with the child." Doc. #51 at p. 1. Again, this statement is well-supported by the record, as Mother left the area in April 2014 and did not see G.P. until early October 2014. Mother then did not see G.P. again until January 27, 2015. There is no evidence that Mother saw G.P. between March 2015 when Father was given custody, and March 2016, when she made her first visit after FCSCC regained custody in December 2015. Finally, Mother did not visit G.P. for many months thereafter, i.e., until November 4, 2016. As was noted, G.P. did not even know who Mother was when she visited in November 2016.

{¶ 61} According to the evidence, G.P. was thriving in his foster care placement, and was adoptable. In fact, the foster parents expressed a desire to adopt him. The record also indicates that FCSCC investigated all family members that Mother and Father suggested, but none of these people were either suitable or interested in taking custody of G.P. Finally, Mother made no progress on her case plan, and showed not even a minimal prospect of ever being able to meet G.P.'s basic needs. Under the circumstances, we find clear and convincing evidence to support the trial court's decision. Accordingly, the Second Assignment of Error is overruled.

IV.   Conclusion

{¶ 62} All of Mother's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies mailed to:

Megan M. Farley
Michael T. Columbus
Linda Cushman
Samantha Berkhofer
Hon. Joseph N. Monnin