[Cite as *In re T.L.*, 2021-Ohio-3221.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the matter of:                                    :

[T.L.] et al.,                                       :

                                              No. 20AP-591

[H.S-T., Mother,                                     :       (C.P.C. No. 17JU-009978)

                                 :        (REGULAR CALENDAR)

       Appellant].                                   :

---

D E C I S I O N

Rendered on September 16, 2021

---

**On brief:** *Yeura Venters,* Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren,* and *Jessica M. Ismond,* for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

JAMISON, J.

{¶ 1} Appellant, H.S-T., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of her two minor children, T.L. and L.L., to plaintiff-appellee, Franklin County Children Services ("FCCS"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In February 2007, H.S-T. gave birth to a daughter, T.L. In January 2008, H.S-T.'s second daughter, L.L., was born. W.L. is the biological father of both children. H.S-T. also has an adult daughter who is not involved in these proceedings.

{¶ 3} On August 10, 2017, FCCS filed a dependency complaint seeking an order of temporary custody of T.L. and L.L. The material allegations in the complaint are as follows:

> On or about, August 9, 2017, [T.L.] and [L.L.] were transported to Franklin County Children Services for safekeeping under LAW status. Mother was pink-slipped to Netcare for observation. Mother was expressing suicidal ideations and stating that she did not want to hurt her children. Mother was having a "nervous breakdown" and was unable to collect her thoughts and was feeling extremely overwhelmed. Mother and her children are currently homeless. They were previously staying in a drug home where there were reportedly lots of people in the home who would sit around and shoot up heroin. Prior to that, Mother and the children were in a shelter. Mother reportedly did not supervise the children and this was a problem in the shelter. Mother is believed to be using heroin and unknown what else. Mother has a kit that has a tourniquet in it that she takes everywhere. The Agency learned that the children found Mother passed out once with a needle in her [arm]. Reportedly, Mother attempted to go to rehab in Texas and was sent back to Ohio. Currently, Mother was offered detox and denied wanting this. Detox was offered because she admitted that she relapsed on heroin within the last week. Mother was also offered assistance with referrals and services by Netcare and the only thing she said she needed help with was obtaining insurance.

(Compl. at 6.)

{¶ 4} On August 10, 2017, the juvenile court issued an emergency custody order granting temporary custody of T.L. and L.L. to FCCS. The juvenile court appointed a guardian ad litem ("GAL") for the two minor children on August 16, 2017.  The juvenile court held an adjudicatory hearing on the complaint on October 5, 2017. H.S-T. appeared at the hearing with court-appointed counsel, but she did not contest the allegations in the complaint.  Both T.L. and L.L. were adjudicated dependent children pursuant to R.C. 2151.04(C).  As a result of the hearing, the juvenile court ordered the children be placed in the temporary court custody of FCCS and adopted the case plan.

{¶ 5} T.L. and L.L. were originally placed by FCCS with foster-parents F.J. and K.J. Just two months into this placement, FCCS removed the children in order to place them with a paternal aunt and uncle.  However, after another two months had passed, the paternal aunt and uncle informed FCCS that they could not meet the needs of the children. FCCS then removed the children from the relatives and placed them with other foster-parents.

{¶ 6}  It was subsequently determined that the children were unhappy at the home of their new foster-parents, and the foster-parents could not meet the needs of the children. The children were removed from the home and returned to the original foster-parents F.J. and K.J., where they have remained.  F.J. and K.J. have now been identified as possible adoptive parents of both children.

{¶ 7}  On January 4, 2019, FCCS filed a motion for permanent custody of T.L. and L.L.  On September 30, 2020, the juvenile court held an evidentiary hearing on the motion for permanent custody.  At the hearing, the juvenile court heard the testimony of H.S-T.; Permanent Family Solutions Network caseworker ("PFSN"), Andrea Brink; and Umberto A. DeBeneditto, the GAL.

{¶ 8}  On November 23, 2020, the juvenile court granted FCCS's motion, committed T.L. and L.L. to the permanent custody of FCCS for the purpose of adoption, and divested H.S-T. and W.L. of any and all parental rights, privileges, and obligations.

{¶ 9}  H.S-T. timely appealed to this court from the November 23, 2020 judgment. W.L. did not appeal.

## II.  ASSIGNMENT OF ERROR

{¶ 10}  Appellant assigns the following as trial court error:

> Assignment of Error: The juvenile court's judgment granting permanent custody to FCCS under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d), and the juvenile court's finding that permanent court commitment of the minor children to Franklin County Children Services is in the minor children's best interests under R.C. 2151.414(B)(1), R.C. 2151.414(D)(1) and R.C. 2151.414(D)(2) is against the manifest weight of the evidence.

## III.  STANDARD OF REVIEW

### A.  Assignment of Error

{¶ 11}  In reviewing a manifest weight challenge to a juvenile court's judgment granting permanent court commitment ("PCC"), an appellate court employs the following standard of review:

> A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence. In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in

> favor of the judgment and the trial court's findings of facts. If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.

(Internal citations and quotations omitted.) *In re J.R.,* 10th Dist. No. 19AP-228, 2020-Ohio-1347, ¶ 27, quoting *In re E.B.,* 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19.

## IV. LEGAL ANALYSIS

### A. Assignment of Error

{¶ 12} In H.S-T's. assignment of error, H.S-T. contends that the juvenile court erred in granting PCC because the weight of the evidence does not support a determination that granting permanent custody to FCCS was warranted under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d), and that permanent custody to FCCS was in the minor children's best interests pursuant R.C. 2151.414(D)(1) and 2151.414(D)(2). We disagree.

{¶ 13} " 'Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).' " *In re J.R.*, 10th Dist. No. 17AP-698, 2018-Ohio-1474, ¶ 37, quoting *In re K.M.,* 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15. Accordingly, when making custody determinations pursuant to R.C. 2151.414, the juvenile court is expressly prohibited from considering the effect the granting of permanent custody to the agency would have upon any parent of the child. R.C. 2151.414(C).

{¶ 14} R.C. 2151.414(B) sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency. R.C. 2151.414 provides in relevant part as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is

in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, *has not been* in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

(d) The child *has been* in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) * * *.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

(Emphasis added.)

{¶ 15} There is no dispute in this case that both T.L. and L.L. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period at the time FCCS filed the motion for PCC.  The record shows that the juvenile court  placed both children in temporary custody of FCCS on October 5, 2017, when they were adjudicated dependent children and that the children have remained in the temporary custody of FCCS throughout this case.  FCCS filed the motion for PCC on January 4, 2019. Because this finding under R.C. 2151.414(B)(1)(d) is not in dispute, the juvenile court did not have to consider whether any of the alternative provisions of R.C. 2151.414(B)(1) applied.  *In re C.W.,* 104 Ohio St.3d 163, 166, 2004-Ohio-6411, ¶ 21; *In re G.P.,* 2d Dist. No. 2016-CA-88, 2017-Ohio-2883; ¶ 54; *In re G.R.,* 7th Dist. No. 17 HA 0002, 2017-Ohio-8917, ¶ 15; *In re K.L.,* 2d Dist. No. 2014-CA-31, 2014-Ohio-5576, ¶ 14.[1] When clear and convincing evidence

---

[1] A finding that R.C. 2151.414(B)(1)(a) applies to the children in this case is at odds with the finding under R.C. 2151.414(B)(1)(d) because subsection (a) requires that the "child *has not been* in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period", whereas a finding under subsection (d) requires that "the child *has been* in the temporary custody of

supports a juvenile court's finding that a child has been in the temporary custody of a child services agency for 12 or more months of a consecutive 22-month period at the time the agency files a motion for PCC, PCC is warranted if clear and convincing evidence supports the trial courts finding that permanent custody to the agency is in the best interest of the child. *In re S.H.,* 2d Dist. No. 24619, 2011-Ohio-4721, ¶ 6; *K.L.* at ¶ 7, fn. 2.

{¶ 16} The trial court found clear and convincing evidence supported the conclusion that permanent custody to FCCS was in the best interest of both children under R.C. 2151.414(D), which provides as follows;

> (2) *If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency*:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
>
> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.
>
> (d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

(Emphasis added.)

{¶ 17} H.S-T. does not dispute that clear and convincing evidence supports the findings required by R.C. 2151.414(D)(2)(b) through (d). The juvenile court expressly determined that both children had been in the temporary custody of FCCS well beyond two years and no longer qualified for temporary custody, they did not meet the requirements for a planned permanent living arrangement, and there were no relatives who could take legal custody of the children. Thus, the disputed issue at trial was the finding required

---

one or more public children services agencies* * * for twelve or more months of a consecutive twenty-two-month period."

under R.C. 2151.414(D)(2)(a), that one or more of the factors in division (E) exist and the children cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

{¶ 18} When the juvenile court determines whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) provides guidance. *See In re. A.E.,* 10th Dist. No. 19AP-782, 2021-Ohio-488,¶ 20, citing *In re B.R.,* 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 44. R.C. 2151.414(E) provides:

> (E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problems that initially caused the child to be placed outside the home, *the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.* In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(Emphasis added.)

{¶ 19} The trial court reached the following conclusion relevant to the determination under 2151.414(D)(2)(a):

> [T]here is no credible evidence to support the conclusion that either Parent, if given more time and all of the financial and social services assistance that have been and continue to be available to them, would be successful in achieving reunification by remedying the problems that initially caused [T.L.] and [L.L.] to be removed from Parents' custody.

> \* \* \*
>
> The Court further concludes: that the return of T.L and L.L. to their own home (the home of their parents) would be contrary to their best interest; that Franklin County Children Services has made reasonable efforts to prevent the removal of T.L. and L.L from their home, to eliminate the continued removal of the children from their home, and safely return the children to their home; and that Franklin County Children Services has made reasonable efforts to finalize the permanency plan in effect for [T.L.] and [L.L.].

 (Nov. 23, 2020 Jgmt. Entry at 13.)

{¶ 20} As the juvenile court noted, each iteration of the court-adopted case plan contained the same conditions for reunification.  The case plan required H.S-T. to do the following:

> (1) Complete an alcohol and drug (AOD) assessment and follow all recommendations.
> (2) Complete random urine screens through ACS with missed screens considered positive/dirty.
> (3) Complete a Mental Health (MH) assessment and follow the recommendations.
> (4) Obtain and maintain a legal source of income.
> (5) Obtain and maintain safe and stable housing.
> (6) Be available for announced and unannounced home visits at least monthly to review progress and address concerns.
> (7) Sign releases of information.

(Nov. 23, 2020 Jgmt. Entry at 13.)

{¶ 21} H.S-T. acknowledged during her testimony that caseworker Brink personally reviewed and explained to her the requirements for reunification and that she understood those requirements.  H.S-T. admitted on cross-examination that in the three years that the custody case has been pending, she had not successfully completed the requirements of the case plan.  She also acknowledged that FCCS provided her with the appropriate referrals and resources to do so.

{¶ 22} H.S-T. testified that in the 14-month period after the adoption of the amended case plan, she made no effort to obtain an alcohol and other drug ("AOD") assessment or otherwise seek treatment for her addiction to heroin and crack cocaine.  She explained that she did not immediately seek treatment for her drug addiction "because I

wasn't ready, obviously, and if I would have went into treatment then, I probably would've done relapsed."  (Sept. 30, 2020 Tr. at 153.)

{¶ 23} On March 28, 2019, H.S-T. first presented to Maryhaven for an AOD assessment and follow-up treatment.  H.S-T. stated that she received inpatient treatment at Maryhaven for more than a month, that she was prescribed Suboxone while at Maryhaven to aide in her treatment, and the physicians at Maryhaven recommended she continue Suboxone for the next two years.  According to H.S-T., her follow-up treatment recommendation was five months of outpatient care.  She admitted during her testimony that she did not complete her outpatient treatment and that she was unsuccessfully discharged by Maryhaven in December 2019.

{¶ 24} H.S-T. did not seek any treatment for her drug addiction between the time of her discharge from Maryhaven in December 2019 to July 2020, when she presented herself into Southeast Healthcare ("Southeast") for substance abuse treatment. H.S-T. testified she received a second AOD assessment at Southeast.  She was again prescribed Suboxone, but elected not to take the drug.  H.S-T. believed her outpatient treatment was to last 8 to 12 weeks and that it included group therapy sessions offered remotely.  Though her treatment plan required her to attend group therapy sessions once per week for 3 hours, H.S-T. admitted at the custody hearing that she has only attended 4 sessions.  Brink testified that she has been informed by Southeast that H.S-T. is currently non-compliant with her outpatient treatment and in danger of being unsuccessfully discharged.

{¶ 25} At the permanent custody hearing, H.S-T. claimed that she last used heroin or crack cocaine approximately 18 months prior to hearing.  She acknowledged, however, that she has not completed the drug treatment portion of the case plan, and she admitted using marijuana a few weeks before the permanent custody hearing.

{¶ 26} The juvenile court concluded that H.S-T. had not completed the required AOD assessment and follow-up treatment portion of her case plan, and the evidence supports that conclusion.

{¶ 27} With respect to the drug screening portion of the case plan, the undisputed evidence shows that H.S-T. submitted to 23 drug screens during the pendency of the case and missed 112 scheduled appointments.  There is also no dispute that missed drug screens are considered positive.  The evidence further establishes H.S-T. did not present to

American Court Services ("ACS") for orientation until September 2018, almost one year after she signed the initial case plan. Her initial drug screen at ACS on September 17, 2018 was positive for cocaine, opiates, and marijuana. The evidence at the custody hearing showed that H.S-T. submitted to drug screening on a more consistent basis in the months leading up to the hearing and that results were positive for marijuana, but no cocaine or heroin use was detected.

{¶ 28} The third condition for reunification in the case plan is a mental health assessment. Brink testified that the treatment at Maryhaven included a mental health assessment and a recommendation of Intensive Outpatient Treatment, including group session three times per week and bi-weekly individual counseling. The mental health component and the AOD follow-up were to be conducted jointly. According to Brink, the Southeast program also contains a mental health component for H.S-T., but that portion of the program has not yet to commenced.

{¶ 29} With regard to her income, H.S-T. testified that she has been working for a temporary employment agency known as Manpower for the last 2 years, that she has recently received a raise in her hourly rate to $14 per hour, and that she typically works 30 to 40 hours per week. When asked to produce evidence to support her employment claim, H.S-T. stated that her wages are deposited directly into her bank account. H.S-T. did not present any pay stubs or bank records to corroborate her employment claim.

{¶ 30} Concerning the safe and stable housing element of the case plan, H.S-T. testified that she currently lives in a five-bedroom home owned by her fiancé's parents. The evidence in the record shows that H.S-T. has lived in the fiancé's parents' home throughout this custody case. The evidence also shows that H.S-T. and her fiancé live in the home with his son, his brother, and his parents. H.S-T. stated her fiancé's mother, H.G., recently informed her that she is welcome to bring the children with her to live in the home if custody is returned to her. H.S-T. admitted that H.G. had not previously consented to such an arrangement.

{¶ 31} Brink testified that H.S-T.'s testimony was the first time she heard that H.G. had given H.S-T. permission to bring the children to the home. According to Brink, when she had previously visited the home, H.G. informed her that she would not consent to such an arrangement. Brink acknowledged that the home was an appropriate residence, but that

she had not formally vetted the other adults living in the home because she did not believe the parents' home was a possible destination for the children.

{¶ 32} The GAL testified that he was not appointed to the case until April 2020, when the previous guardian recused due to a conflict. Consequently the GAL did not meet with the children until August 25, 2020, and he was unable to schedule an interview with H.S-T. He related that both children expressed a strong desire to be reunited with their mother. The GAL also spoke with the foster-parents and observed their interaction with T.L. and L.L. The GAL testified that both children have bonded with their foster-parents as well as the other children in the foster home; they are comfortable with their foster-parents and look to their foster-mother, F.J., for comfort. The GAL made the following recommendation regarding PCC:

> A. Reluctantly, I'm in favor of PCC and I told - - - I actually spoke to mother outside 'cause (sic) I don't like doing this. * * * I've only recommended it one other time that I remember. And * * * I'm - - - what's the word I want to say? I want to - - - I'm just glad. * * * I commend her that she's been - - - apparently been doing much better recently, but it's hard to ignore the past. And based on what - - - when I didn't have a chance to meet with her and I told her that, but based on what I've learned from this case, I don't have much choice, I think. The kids need permanency despite the fact that they don't want to leave mother. And I'm also encouraged by the fact that if * * * PCC is granted and placement remains with [F.J.] and [K.J.], they have an open relationship with mother, so it wouldn't end her contact with the children and that's * * * the most positive thing I can think about with this recommendation.
>
> Q. [W]hat are * * * some of the things that would concern you about reunification with mother?
>
> A. * * * I am concerned that * * * as late as * * * 10 or 11 days ago or 13 days or whatever my math is, she was smoking marijuana. * * * I don't find marijuana to be addictive, I'm no scientist, but * * * to have to smoke a week before bothers me. * * * I'm concerned. * * * [S]omething like this is extremely important and to smoke for whatever reason is a concern.

(Sept. 30, 2020 Tr. at 134-35.)

{¶ 33} Brink testified that she is a child protection advocate ("CPA") for PFSN. According to Brink, her responsibilities as a CPA "are to assess the family's needs based on the concerns that were reported in, assist with referring them for the various services in the community; monitoring those referrals, monitoring drug screen results, collaborating with law enforcement of other community service providers, attending court hearings and providing updates, meeting with my families on a monthly basis at a minimum." (Sept. 30, 2020 Tr. at 46, 47.) Brink began working on this case after H.S-T. was "pink-slipped" to Netcare due to a mental health crisis and gave up her children to FCCS. Brink learned that H.S-T. had reported to Netcare that she was unable to take care of her children due to homelessness and heroin use. (Sept. 30, 2020 Tr. at 55.)

{¶ 34} Brink testified that after H.S-T.'s impatient treatment at Netcare, a case plan was filed on October 11, 2017, that required her to complete an AOD assessment with follow-up treatment and periodic drug screens but that H.S-T. did not report for orientation with ACS until September 2018 and did not submit herself for an AOD assessment until March 2019. According to Brink, H.S-T. was unsuccessfully discharged from Maryhaven due to poor attendance at the outpatient level and poor communication.

{¶ 35} According to Brink, as of the date of the custody hearing, H.S-T. has not completed drug treatment at Southeast, and it has been reported to her that H.S-T. is currently non-compliant. Brink opined that H.S-T. has not demonstrated substantial compliance with the case plan.

{¶ 36} With regard to visitation with the children and her parenting skills, Brink stated that H.S-T. has consistently visited with the children, she is bonded with the children, they are bonded with her, and H.S-T.'s parenting skills are not in question. Brink related T.L. is now 13 years old, and she is receiving medication and psychiatric therapy as treatment for anxiety and depression. L.L. is now 12 years old, and she receives psychiatric counseling due to severe anxiety and past trauma.

{¶ 37} In determining whether H.S-T. had substantially remedied conditions causing the children to be placed outside her home, the trial court found that FCCS "made reasonable efforts to prevent the removal of [T.L.] and [L.L.] from their home, to eliminate the continued removal of the children from their home, and safely return the children to their home; and that Franklin County Children Services has made reasonable efforts to

finalize the permanency plan in effect for [T.L.] and [L.L.]." (Nov. 23, 2020 Jgmt. Entry at 13.) In making this determination, the trial court considered H.S-T.'s utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to her by FCCS, by and through caseworker Brink, for the purpose of changing her conduct to allow her to resume and maintain her parental duties. R.C. 2151.414(E).

{¶ 38} Brink provided undisputed testimony that she referred H.S-T. to appropriate service providers to help her complete both the AOD assessment and follow-up, and the drug screens. Though H.S-T. testified that she faced certain obstacles regarding the completion of several components of the case plan, she expressed no dissatisfaction with the services offered to her by her caseworker.

{¶ 39} Based on the evidence presented at the custody hearing, it is reasonable to conclude that H.S-T. repeatedly failed, over a period of three years, to both complete an AOD assessment and follow all recommendations, and complete random urine screens through ACS. H.S-T.'s admission she failed to complete these critical components of the case plan provided the trial court with competent, credible evidence establishing that H.S-T. failed to remedy her problems with substance abuse and addiction that led to the placement of her children in the temporary custody of FCCS.

{¶ 40} *In re J.R.,* 10th Dist. No. 17AP-698, 2018-Ohio-1474, is a case decided under similar facts to those present in this case. In that case, the child, J.R., had been removed from mother's custody after he tested positive for cocaine and marijuana at birth. Mother understood her case plan for reunification with J.R. included an alcohol and drug assessment, taking classes, and getting drug screens. At the custody hearing, mother testified that "she had not used cocaine in the past year or two and had not used marijuana in the past several months," but the trial court did not find mother credible. *Id.* at ¶ 46. This court held that an award of permanent custody to FCCS was in J.R.'s best interest under R.C. 2151.414(D)(2) because J.R. had been in custody of the agency for the entire two-year period preceding the motion for permanent custody, mother had not resolved her substance abuse issues, her employment had not yielded a secure home for the child, and even though J.R. had bonded with mother, he had also bonded with his foster-parents.

{¶ 41} Here, H.S-T. failed to convince the trial court that her problems with substance abuse were behind her, she recently tested positive for marijuana, and she admitted that she had smoked marijuana a few weeks prior to the scheduled custody hearing. The GAL testified that H.S-T.'s recent marijuana use was a concern. H.S-T. admitted that she has not completed her drug treatment program at Southeast, and it is not disputed that H.S-T. missed 112 scheduled drug screenings. Though the trial court believed H.S-T's. unsubstantiated claim that she is currently employed, the trial court was not persuaded by H.S-T.'s uncorroborated testimony that H.G. recently changed her position regarding the children living in her home if H.S-T. regained custody. The evidence established that H.S-T. is bonded with T.L. and L.L. and them with her, but both Brink and the GAL testified that T.L. and L.L. have also bonded with their foster-parents, and the foster-parents have bonded with T.L. and L.L.

{¶ 42} In our view, the facts of this case are similar to those in the *In re J.R.*, 2018-Ohio-1474, and the same result is required. Our review of the record reveals sufficient competent credible evidence to support the juvenile court's finding, by clear and convincing evidence, that T.L. and L.L. cannot be placed with H.S-T. within a reasonable time or should not be placed with her. Father, W.L., has not appealed the juvenile court's judgment.

{¶ 43} To the extent that H.S-T. claims her recent progress regarding the case plan warrants an extension of time for her to remedy the conditions causing the children to be placed outside her home, H.S-T. has not challenged the juvenile court's determination that T.L. and L.L. no longer qualify for temporary custody pursuant to R.C. 2151.415(D). That section provides:

> (4) No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and *the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier,* regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

(Emphasis added.)

{¶ 44} The juvenile court granted FCCS temporary custody of both children on October 10, 2017, the children have remained in the temporary custody of FCCS throughout this case, and there is no relative available for placement. Thus, granting an extension of

temporary custody was not an option for the juvenile court, even if the court had been inclined to grant an extension. Moreover, the juvenile court found "no credible evidence to support the conclusion that either Parent, if given more time and all of the financial and social services assistance that have been and continue to be available to them, would be successful in achieving reunification by remedying the problems that initially caused [T.L.] and [L.L.] to be removed from Parents' custody." (Nov. 23, 2020 Jgmt. Entry at 13.) The record contains competent credible evidence to support the juvenile court's finding.

{¶ 45} When the juvenile court makes the four enumerated findings under R.C. 2151.414(D)(2), permanent custody is in the child's best interest, as a matter of law, and the court shall commit the child to the permanent custody of the agency. *In re J.R.*, 2018-Ohio-1474, at ¶ 41 ("R.C. 2151.414(D)(2) sets forth a specific set of circumstances where granting permanent custody to FCCS is per se in the best interest of the child."). Because R.C. 2151.414(D)(1) is an alternative basis for making the best interest determination, further consideration of the best interest factors under R.C. 2151.414(D)(1) is unnecessary. *See In re K.H.*, 2d Dist. No. 2009-CA-80, 2010-Ohio-1609, ¶ 54 ("As we understand division (D)(2), if all of the facts enumerated therein apply, then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1)."); *In re M.K.,* 10th Dist. No. 09AP-1141, 2010-Ohio-2194, ¶ 22 (agreeing with the well-reasoned analysis in *In re K.H*).

{¶ 46} The juvenile court nevertheless conducted the discretionary best-interest analysis and following consideration of all the relevant factors, the court determined, alternatively, PCC was in the best interest of T.L. and L.L under R.C. 2151.414(D)(1). On this record, we cannot say that the juvenile court erred in weighing the relevant factors and determining that PCC was in the best interests of T.L. and L.L. The juvenile court concluded that T.L.'s and L.L.'s need for legally secure placement could not be achieved without PCC, even though the children had expressed their desire for reunification. Given the children's particular psychological needs, their custodial history, and H.S-T.'s admitted failure to complete the principal components of the case plan, competent credible evidence in the record supports the juvenile court's conclusion that PCC is in the best interests of T.L. and L.L. under R.C. 2151.414(D)(1).

{¶ 47} Based on the foregoing analysis, we hold that the juvenile court's determination that PCC was warranted under R.C. 2151.414(B)(1)(d) and that PCC is in the best interest of T.L. and L.L., is not against the manifest weight of the evidence. Accordingly, the juvenile court did not err when it granted the motion for permanent court custody of T.L. and L.L.  The sole assignment of error is overruled.

## V. CONCLUSION

{¶ 48}  Having overruled H.S-T's. sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN, P.J., and BEATTY BLUNT, J., concur.

_____