[Cite as *In re A.R.*, 2024-Ohio-5958.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [A.R.], | : | |
| | : | No. 23AP-664 |
| [M.R.] Mother, | | (C.P.C. No. 18JU-5580) |
| | : | |
| Appellant. | : | (REGULAR CALENDAR) |
| | : | |
| In re: [A.R.], | : | |
| | : | No. 23AP-683 |
| [A.S., Mother's long-time live-in, Paramour], | | (C.P.C. No. 18JU-5580) |
| | : | |
| | | (REGULAR CALENDAR) |
| Appellant. | : | |

D E C I S I O N

Rendered on December 23, 2024

**On brief:** *Mitchell A. Williams*, Public Defender, and *George M. Schumann*, for appellant M.R.

**On brief:** *William T. Cramer*, for appellant A.S.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

LELAND, J.

{¶ 1} In these consolidated appeals, appellants, M.R. and A.S., appeal from a decision and entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of M.R.'s daughter, A.R., to appellee, Franklin County Children Services ("FCCS").

## I. Facts and Procedural History

{¶ 2}   The following background facts are taken from the trial court's decision and entry of October 11, 2023, granting FCCS's motion for permanent custody, as well as from the record of proceedings.  Appellant M.R. (hereafter "M.R." or "mother"), is the mother of A.R.; appellant A.S. "is mother's long-time live-in paramour." (Oct. 11, 2023 Decision at 2.)  At the time of the trial court's decision on permanent custody, paternity had not been established with respect to A.R., then age 15, but "[a]n alleged father was identified as [G.A.]." (Oct. 11, 2023 Decision at 2.)  Mother, "[d]espite inquiry, * * * has not identified or named any other potential biological father." (Oct. 11, 2023 Decision at 2.)

{¶ 3}   FCCS and the juvenile court have been involved with the family since May 8, 2018, "when law enforcement took emergency custody of [A.R.]." (Oct. 11, 2023 Decision at 3.)  On May 9, 2018, a complaint was filed alleging A.R. was an abused, neglected and dependent child.  On May 17, 2018, "[A.R.] was returned to her mother's home" under a temporary order of protective services, and A.S. "was made a third party to this matter." (Oct. 11, 2023 Decision at 3.)

{¶ 4}   On May 18, 2018, the juvenile court appointed attorney Carol Moncif as guardian ad litem ("GAL") to the case.  On June 15, 2018, the GAL filed a motion for emergency shelter care "[w]hen mother failed to cooperate with the [GAL's] investigation and interfered with the [GAL's] interview of [A.R.]." (Oct. 11, 2023 Decision at 3.)

{¶ 5}   By entry filed August 17, 2018, "the agency dismissed counts relative to allegations of abuse and neglect and proceeded on the dependency allegations." (Oct. 11, 2023 Decision at 3.)  A magistrate of the juvenile court issued a report finding A.R. "to be dependent pursuant to [R.C.] 2151.04(C)." (Oct. 11, 2023 Decision at 3.)  Following a dispositional hearing, the court granted temporary custody to FCCS, and A.R. "was again removed from her mother's care and placed into foster care." (Oct. 11, 2023 Decision at 3.)  A case plan was approved and adopted by the court, and "[t]he goal" of the case plan "was reunification with [A.R.'s] parent(s)." (Oct. 11, 2023 Decision at 4.)

{¶ 6}   On March 25, 2019, FCCS filed a motion for extension of temporary custody.  On May 13, 2019, the juvenile court filed an entry sustaining the agency's motion.  On August 30, 2019, FCCS filed a motion for a second extension of temporary custody.  On January 29, 2020, the magistrate filed a decision recommending the juvenile court extend

the temporary custody order for an additional period of up to six months. The juvenile court adopted that recommendation.

{¶ 7} On February 25, 2020, FCCS filed a motion for permanent court commitment ("PCC") of A.R. The matter came for hearing before the juvenile court on October 3, 2023. FCCS called Jacqueline Smith, a caseworker for FCCS, as its first witness. Smith was assigned to the case in May 2020. Smith testified that A.R.'s mother is M.R., and the biological father "was reported to be unknown," although the name of an individual, G.A., "came about * * * as alleged father." (Oct. 3, 2023 Tr. at 15.) Paternity with respect to G.A. has not been established.

{¶ 8} FCCS first became involved with the family "due to physical abuse concerns. It was reported that [A.R.] had marks on her neck that appeared to be bite marks." (Oct. 3, 2023 Tr. at 16.) In May 2018, the juvenile court issued an emergency custody order, and M.R. "regained custody" that same month." (Oct. 3, 2023 Tr. at 16.) FCCS subsequently regained temporary custody of A.R., and the child has remained in the continuous custody of FCCS since August 2018. During that time, A.R. has had three foster-care placements, with the most recent placement in December 2022.

{¶ 9} At the time FCCS received temporary custody, the juvenile court approved and adopted a case plan for M.R., and A.S. was included as a case plan participant. The goal of the case plan was reunification, and the objectives for M.R. included completing "a psychological assessment," and to "follow all recommendations and to sign all requested releases of information." (Oct. 3, 2023 Tr. at 20.) A.S. had similar case plan objectives.

{¶ 10} In 2019, both M.R. and A.S. completed psychological assessments. In 2021, FCCS requested that M.R. and A.S. complete updated evaluations. M.R. completed her assessment in August 2021, and A.S. completed his assessment in September 2021. M.R. and A.S. subsequently linked with an agency for individual counseling. The treatment services for M.R. were "geared toward anger management." (Oct. 3, 2023 Tr. at 23.) M.R. indicated to Smith "[s]he didn't feel that she needed" anger management services. (Oct. 3, 2023 Tr. at 24.) FCCS referred M.R. and A.S. for parenting programming services, and they completed "the TAPP Program." (Oct. 3, 2023 Tr. at 26.)

{¶ 11} During Smith's involvement in the case, M.R. has resided with her mother in Worthington, where A.S. also resides. M.R.'s mother recently "sold the home," and M.R. informed Smith "[t]hey are [going to] be moving into an extended stay hotel until their

housing becomes available." (Oct. 3, 2023 Tr. at 29-30.) M.R. and A.S. expect to move to West Virginia "within the next few weeks." (Oct. 3, 2023 Tr. at 30.)

{¶ 12} At the outset, the case plan included visitation for M.R. and A.S. Specifically, the plan provided for "[o]ne hour of visitation at the agency weekly to be supervised by the agency or designee." (Oct. 3, 2023 Tr. at 30.) M.R. and A.S. attended visitations with A.R. "[f]rom the start of the case until August of 2019," but visitation was thereafter suspended. (Oct. 3, 2023 Tr. at 32.)

{¶ 13} Smith "spoke with [A.R.] monthly about having visits or contact with [M.R.]." (Oct. 3, 2023 Tr. at 33.) Smith did not believe A.R. wanted to re-engage in visits with M.R. A.R. recently had the opportunity to visit with M.R. at A.R.'s request. The visitation "went well," and both M.R. and A.R. "shared how they were feeling." (Oct. 3, 2023 Tr. at 33.) While "neither one of them said the things that either one of [them] wanted to hear, * * * it was still a smooth visit." (Oct. 3, 2023 Tr. at 33.)

{¶ 14} FCCS made attempts to reach out to the alleged father but did not receive any response. FCCS did not explore the maternal mother as a potential placement because "[M.R.] and [A.S.] resided with maternal grandmother." (Oct. 3, 2023 Tr. at 34-35.)

{¶ 15} A.R. has an "IEP" and she also has "some slight cognitive delays and * * * anxiety." (Oct. 3, 2023 Tr. at 35.) A.R. participates in therapeutic services through an agency, where she receives "individual counseling." (Oct. 3, 2023 Tr. at 35.) A.R. was initially placed with a foster couple for "about two months," but the placement ended due to "foster family obligations" and "not being able to care for her needs." (Oct. 3, 2023 Tr. at 36.) A.R. was placed with another individual until December 2022, at which time she was placed with her current foster parents.

{¶ 16} Smith has visited A.R. at her current foster home twice a month. Smith testified that A.R. has "bonded well" with her foster parents. (Oct. 3, 2023 Tr. at 37.) A.R. is "really attached" to her foster mother, and "[t]hey do a lot of family stuff together." (Oct. 3, 2023 Tr. at 37.)

{¶ 17} Smith described A.R.'s interaction with M.R. as "distant. A.R. * * * hasn't seen * * * her mom since August of 2019," and "it was very distant kind of; it was standoffish." (Oct. 3, 2023 Tr. at 38.) When asked whether A.R. was bonded with her mother, Smith responded: "Not really, no." (Oct. 3, 2023 Tr. at 38.) Smith stated that A.R.'s relationship with A.S. was also "distant * * * and standoffish a bit." (Oct. 3, 2023 Tr.

at 38.)  During one encounter outside of the courtroom, M.R. "approached [A.R.] just to speak and say hi to her and [A.R.] immediately kind of just * * * went into a shell and she kinda froze," so she was "immediately removed from the situation and taken into * * * a little separate conference room."  (Oct. 3, 2023 Tr. at 39.)  Smith expressed concern that mother and A.R. "have only seen each other twice since 2019 and they're not familiar with each other anymore and they would have to learn each other again."  (Oct. 3, 2023 Tr. at 40.)

{¶ 18}  On cross-examination, Smith testified there had been no attempts to initiate either family counseling or reunification counseling.  Smith testified that any time A.R.'s counselor "would talk to [A.R.] * * * about doing a family counseling, [A.R.] would say no." (Oct. 3, 2023 Tr. at 72.)  Smith stated she will "not force a kid to go."  (Oct. 3, 2023 Tr. at 81.) A.R. indicated to Smith she would possibly have a relationship with her mother moving forward if she were to be adopted.

{¶ 19}  FCCS also called Leslie Armstrong, A.R.'s current GAL, as a witness. Armstrong was appointed to the case in June 2022, replacing the "previous" GAL, Carol Moncif, "who had to withdraw."  (Oct. 3, 2023 Tr. at 126.)  Armstrong interviewed M.R. and A.S. at their home, and observed A.R. at her previous and current foster homes.

{¶ 20}  Armstrong testified A.R. and her current foster parents "seem bonded with each other," and "specifically they show affection for her" and "[s]he seems to have affection for them."  (Oct. 3, 2023 Tr. at 128.)  The foster parents are "working on helping her with her coping skills, having her be accountable for what she says and what she does as well as being able to control how she reacts with anger."  (Oct. 3, 2023 Tr. at 128.)  The foster parents "seem very well informed from Melissa Saunders the counselor of how to deal with [A.R.'s] needs."  (Oct. 3, 2023 Tr. at 128.)

{¶ 21}  Armstrong also observed A.R.'s interaction with her mother during "a meeting that was set up at Children Services and there were other people present."  (Oct. 3, 2023 Tr. at 129.)  A.R. wanted "both of her foster parents present and to her credit [M.R.] agreed to that, * * * as did [A.S.] because it made [A.R.] feel more comfortable so they did agree to that."  (Oct. 3, 2023 Tr. at 129.)  A.R. "was quite nervous at the beginning of the meeting."  (Oct. 3, 2023 Tr. at 129.)  A.R. was unsure as to how M.R. and A.S. "were going to respond to what she had to say but they did listen quietly while she did speak about what she wanted."  (Oct. 3, 2023 Tr. at 129.)

{¶ 22} During that meeting, M.R. "had to keep being reminded to listen, to take in what she was saying and not to just respond with a lot of defensiveness in terms of talking about what a perfect childhood she had, how she had everything she needed, * * * what a good mother she had been and really * * * at some point reacting in a rather angry manner that [A.R.] was stating that she did not want to come home and really she just had a failure to understand the reasons." (Oct. 3, 2023 Tr. at 129-30.) M.R. "made a lot of promises in terms of how wonderful [A.R.'s] life would be if she returned home and those oftentimes related to material goods." (Oct. 3, 2023 Tr. at 130.) Armstrong stated "[t]here were some positive interactions at the meeting," and "[t]hey were asked if they wanted to hug to say goodbye and they did do that." (Oct. 3, 2023 Tr. at 130.)

{¶ 23} Armstrong stated "it's not a typical parent-child relationship." (Oct. 3, 2023 Tr. at 130.) A.R. is "15 and [a] half now so she's several years older than she was when she parted ways and when she stopped seeing * * * her mother." (Oct. 3, 2023 Tr. at 130.) Armstrong opined it was "difficult to say" whether A.R. appeared bonded to M.R. during the recent meeting. (Oct. 3, 2023 Tr. at 130.) A.R. "said she loved her" and "said she will always think of [M.R.] as her mother * * * [s]o, in that regard I think yes, * * * there is a bonding * * * that exists there." (Oct. 3, 2023 Tr. at 130-31.) Armstrong further opined: "There is not a bonding to the degree where she feels safe or comfortable or wants to reside in her home or even spend time with visits right now." (Oct. 3, 2023 Tr. at 131.)

{¶ 24} Armstrong testified A.R. was not bonded with A.S. During the recent meeting, A.R. "primarily wanted to address her mother and * * * she primarily addressed her mother and did not really address [A.S.]." (Oct. 3, 2023 Tr. at 131.) A.R. "has always said to [Armstrong] she does not perceive him as the father figure." (Oct. 3, 2023 Tr. at 131.) Armstrong has never been able to make contact with G.A.

{¶ 25} A.R. currently attends a high school with a good IEP program. A.R. has "a really good relationship with the counselor." (Oct. 3, 2023 Tr. at 133.) Armstrong opined A.R. was mature enough to understand the nature of the proceedings.

{¶ 26} When questioned about the wishes of A.R., Armstrong testified A.R. "previously" wanted to be adopted by her second foster caregiver, and "since then she has wanted to be adopted" by her current foster couple. (Oct. 3, 2013 Tr. at 134.) A.R. "has steadfastly indicated she did not want to return home. Previously also she did not want to have any contact with her mother and [A.S.] and then she had wanted to have some contact

with them to tell them that she did not want to return home. She still, however, did not want to have regular visits set up." (Oct. 3, 2023 Tr. at 134.)

{¶ 27} Armstrong recommended that "the PCC be granted" as in the "best interest" of the minor. (Oct. 3, 2023 Tr. at 135.) Armstrong testified "it's in accordance with [A.R.'s] wishes," and Armstrong believed "it is a factor that should be weighed very, very heavily in this case." (Oct. 3, 2023 Tr. at 135.) Armstrong expressed concerns about M.R.'s ability to parent a child.

{¶ 28} On cross-examination, Armstrong stated visitation was not occurring based in part on a recommendation by the previous GAL "for therapeutic reasons and based upon what [the former GAL] thought was indicated by the counselor." (Oct. 3, 2023 Tr. at 147.) After Armstrong was appointed GAL, "there was a change in the court order that would allow parents to have visits * * * if her current counselor thought it would be beneficial to her and if [A.R.] requested it." (Oct. 3, 2023 Tr. at 147.) Armstrong testified that, at the time, "I started to explore whether or not [A.R.] would want those sorts of visits because I too found it somewhat problematic that there had been no attempt at all for any kind of contact, any kind of progress in that direction either therapeutically or any other way." (Oct. 3, 2023 Tr. at 147.) According to Armstrong, A.R. "was adamant at that time that she did not want visits set up except to tell * * * [M.R. and A.S.] what her wishes were. Also, at that time her therapist did not think it would be beneficial for her to have visits." (Oct. 3, 2023 Tr. at 147.)

{¶ 29} By decision and entry filed October 11, 2023, the juvenile court granted permanent custody of the minor to FCCS for purposes of adoption. In its decision, the juvenile court found, with respect to the provisions of R.C. 2151.414(B)(1), that A.R. "has been abandoned by her biological father/John Doe," and that A.R. "has been in the temporary custody of the agency for twelve or more months prior to the filing of the agency's Motion." (Oct. 11, 2023 Decision at 6.) The juvenile court also addressed the best-interest factors under R.C. 2151.414(D), and concluded the grant of permanent custody of A.R. to FCCS was in her "best interest." (Oct. 11, 2023 Decision at 12.)

## II. Assignments of Error

{¶ 30} Appellant M.R. appeals and assigns the following two assignments of error for our review:

[I.] The juvenile court committed reversible and plain error when it terminated the parental rights of the mother where the mother was denied an opportunity to reunite with the child in violation of the mother's fundamental liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[II.] The juvenile court's judgment that permanent court commitment of the minor child to Franklin County Children Services was in the minor child's best interests is against the manifest weight of the evidence.

{¶ 31} Appellant A.S. appeals and assigns the following two assignments of error:

[I.] The juvenile court committed reversible and plain error when it terminated the parental rights of the mother where the mother was denied an opportunity to reunite with the child in violation of the mother's fundamental liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[II.] The juvenile court's judgment that permanent court commitment of the minor child to Franklin County Children Services was in the minor child's best interests is against the manifest weight of the evidence.

## III. Analysis

{¶ 32} Because M.R. and A.S. have submitted identical assignments of error, and raise essentially identical arguments, we will consider them jointly. Further, while issues raised under the first and second assignments of error are interrelated, we will address the assignments of error in inverse order.

{¶ 33} Under the second assignment of error, M.R. and A.S. (jointly "appellants") assert the juvenile court's decision to grant FCCS permanent custody is against the manifest weight of the evidence. Specifically, appellants challenge the juvenile court's best-interest determinations under R.C. 2151.414(D)(1).

{¶ 34} At the outset, we recognize "[t]he Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution protects an individual's right to parent one's child." *In re J.C.*, 10th Dist. No. 23AP-83, 2024-Ohio-5107, ¶ 27, citing *In re L.M.*, 10th Dist. No. 21AP-580, 2023-Ohio-4326, ¶ 41, citing *In re T.N.*, 10th Dist. No. 21AP-429, 2022-Ohio-2784, ¶ 45, citing *In re*

*H.S.*, 10th Dist. No. 21AP-190, 2022-Ohio-506, ¶ 47, citing *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6.  On this issue, "[p]ermanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case" and, therefore, "parents must be afforded every procedural and substantive protection the law allows." (Internal quotations omitted.)  *Id.*, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 35} Such rights, however, "are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 13, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). "Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child." *Id.*, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 36} Under Ohio law, "the termination of parental rights is governed by R.C. 2151.414." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42.  A trial court "applies a two-part permanent custody test under R.C. 2151.414." *In re S-C.N.*, 10th Dist. No. 21AP-544, 2022-Ohio-3064, ¶ 62, citing *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914.  The court initially "determines by clear and convincing evidence that one of five possible statutory grounds in R.C. 2151.414(B)(1) is established," and "[o]nly one of the grounds must be met to satisfy the first prong of the two-part permanent custody test." *Id.*, citing *In re K.P.*, 12 Dist. No. CA 2021-11-016, 2022-Ohio-1347, ¶ 17.  If one of those five grounds is established, "the trial court then determines if permanent custody is in the best interest of the child under the factors set forth in R.C. 2151.414(D)." *Id.*, citing *K.P.* at ¶ 18.

{¶ 37} R.C. 2151.414(B)(1) states in part as follows:

> [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶ 38}** In the instant case, FCCS moved for permanent custody alleging three of the grounds under R.C. 2151.414(B)(1); specifically, R.C. 2151.414(B)(1)(a), (b) and (d). The juvenile court found FCCS presented clear and convincing evidence regarding the circumstances under R.C. 2151.414(B)(1)(b) (finding A.R. had been abandoned by her biological father) and R.C. 2151.414(B)(1)(d) (finding A.R. "has been in the temporary custody of the agency for twelve or more months prior to the filing of the agency's Motion"). (Oct. 11, 2023 Decision at 6.)

**{¶ 39}** On appeal, appellants do not dispute the juvenile court's finding that A.R. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Therefore, because the court's finding under R.C. 2151.414(B)(1)(d) "is not in dispute, the juvenile court did not have to consider whether any of the alternative provisions of R.C. 2151.414(B)(1) applied." *In re T.L.*, 10th Dist. No. 20AP-591, 2021-Ohio-3221, ¶ 15, citing *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 21; *In re G.P.*, 2d Dist. No. 2016-CA-88, 2017-Ohio-2883, ¶ 54; *In re G.R.*, 7th Dist. No. 17 HA 0002, 2017-Ohio-8917, ¶ 15; *In re K.L.*, 2d Dist. No. 2014-CA-31, 2014-Ohio-5576, ¶ 14.

**{¶ 40}** Upon a trial court's finding "that one of the circumstances in R.C. 2151.414(B)(1)(a) through (d) apply, the trial court then must determine whether a grant of permanent custody is in the best interest of the child." *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16. FCCS has the burden to "prove by clear and convincing evidence that an award of permanent custody is in the child's best interest." *Id.* The standard of "[c]lear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be

established." *Id.*, citing *In re A.P.*, 10th Dist. No. 08AP-186, 2009-Ohio-438, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435.

{¶ 41} A juvenile court's "determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re M.W.* at ¶ 15, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. In this respect, " '[p]ermanent custody judgments which are supported by some competent, credible evidence going to all essential elements of a case will not be reversed as being against the manifest weight of the evidence.' " *Id.*, citing *In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 18, citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 42} R.C. 2151.414(D)(1) states in relevant part:

> In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 43} The juvenile court made findings with respect to each of the factors under R.C. 2151.414(D). In addressing the first factor (i.e., the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers under R.C.

2151.414(D)(1)(a)), the juvenile court found A.R. "no longer has a parent-child bond with her mother," and that it was unclear to the trier of fact if A.R. "was ever emotionally bonded" to A.S. (Oct. 11, 2023 Decision at 7.) The court noted A.R., M.R. and A.S. recently "met in the presence of [A.R.'s] counselor to discuss [A.R.'s] wishes." (Oct. 11, 2023 Decision at 7.) The juvenile court found A.R. "has grown to be understanding and empathetic towards her mother" and, "[a]t the end of the meeting, [A.R.] told her mother that 'she loved her and will always think of her as her mother' and agreed to hug her goodbye." (Oct. 11, 2023 Decision at 7.)

{¶ 44} Further, the court found, although A.R. "has not been in her current foster home quite a year, it is evident that [A.R.] has developed a loving, trusting supportive bond with her current foster parents," where A.R. resides "with a younger foster brother whom she gets along with." (Oct. 11, 2023 Decision at 8.) A.R. "describes being happy and integrated in her current high school," where she has established friends and relationships. (Oct. 11, 2023 Decision at 8.) The court observed A.R. "has worked with the same mental health counselor since she was approximately 10 years old and has established an excellent working therapeutic relationship with this individual." (Oct. 11, 2023 Decision at 8.) The court also made findings A.R. "does not know her biological father," and that she "still has an emotional connection with her maternal grandmother." (Oct. 11, 2023 Decision at 8.)

{¶ 45} The juvenile court, having interviewed A.R. at the commencement of the PCC hearing, made the following findings with respect to R.C. 2151.414(D)(1)(b) (requiring the court to consider the wishes of the child, as expressed directly by the child or through the child's GAL). A.R. "likes her current school" and, although she "may have some intellectual challenges and is on an IEP, she does not seem delayed or disabled," and "appears mature beyond her years and very clear of thought." (Oct. 11, 2023 Decision at 8.) The court found A.R., age 15 and one-half years at the time of the October 2023 hearing, was "mature enough and intelligent enough to understand the nature of these proceedings and the concept of permanent legal termination of her relationship with her mother." (Oct. 11, 2023 Decision at 9.) A.R. "still very much wants to be adopted and is cautious in her optimism that her current foster parents would be able to adopt her should this Motion be granted." (Oct. 11, 2023 Decision at 9.)

{¶ 46} The juvenile court found it "painfully evident" A.R. was "distress[ed] at the discussion of the possibility of the Court forcing her back with her mother," and the court

noted the fact A.R., "just days before" the start of the trial, "personally told her mother and [A.S.] that she did not want to return home and wishes to be adopted." (Oct. 11, 2023 Decision at 9.)

{¶ 47} With respect to the third best-interest factor under R.C. 2151.414(D)(1)(c) (the custodial history of the child), the juvenile court found A.R. "has been in three different foster cares over the last five years," the first foster placement ending after two months "due to a change in obligation for the foster parents," and the second placement lasting "approximately 26 months" but "disappointedly disrupted as A.R. became a teenager" and the foster parent and A.R. "began to clash." (Oct. 11, 2023 Decision at 10.) A.R.'s current placement began "approximately 10 months ago," and the current foster caregivers "are also prospective adoptive parents." (Oct. 11, 2023 Decision at 10.)

{¶ 48} The juvenile court observed "[i]t is reported that [M.R.'s] mother sold the home that [M.R.] and [A.S.] were residing, and [M.R.] and [A.S.] are moving to West Virginia." (Oct. 11, 2023 Decision at 10.) While A.R. has been in her current community and school for several years, M.R. "has not been involved in [A.R.'s] education since [A.R.] was placed in foster care." (Oct. 11, 2023 Decision at 10.) The court found A.R. "is maturing and thriving in her current placement," and A.R.'s foster parents "are supportive of [A.R.'s] emotional and educational development." (Oct. 11, 2023 Decision at 10.) Further, A.R. "is supported in her need to continue psychological counseling to address the past trauma in her life" and, while "she does not desire any contact with [M.R.] or [A.S.] at this time, [A.R.] knows that even if [her current foster parents] adopt her she would be free to contact her biological family should she desire to do so." (Oct. 11, 2023 Decision at 10.)

{¶ 49} Regarding the child's need for a legally secure permanent placement, under R.C. 2151.414(D)(1)(d), the juvenile court found it "evident" that "the best possibility for [A.R.] to be able to achieve what she so desperately wants" is to grant the motion for permanent custody "and to allow [A.R.] and FCCS to move forward with finalizing an adoption before her 18th birthday." (Oct. 11, 2023 Decision at 10.)

{¶ 50} Appellants argue that findings by the juvenile court on the best-interest factors, including findings that A.R. no longer had a parent-child bond with mother, that A.R. wanted to be adopted and did not want to reunify with mother, that she had been in her current placement for several years without mother's involvement, and that A.R. did not desire contact with mother, all "describe the parent-child alienation and estrangement

that existed at the time of the hearing on the PCC motion." (Appellants' Brief at 41.) Appellants maintain "[t]his alienation and estrangement resulted from a complete separation of [M.R.] from [A.R.] for over four years," and was due to the denial of any visitation. (Appellants' Brief at 41-42.) According to appellants, the lack of visitation for such a lengthy period of time was due to FCCS's failure to make reasonable efforts at reunification, and appellants maintain the denial of visitation distorted the evidence relied on by the juvenile court in weighing the best-interest factors.

{¶ 51} In light of appellants' claim that the denial of visitation affected the juvenile court's best-interest analysis, we consider the record evidence pertinent to that issue. At the outset of the case, on May 10, 2018, a magistrate conducted a preliminary hearing on an emergency care order filed by FCCS, in which the agency sought temporary custody of A.R. due to allegations in the complaint that A.R. "was observed" on April 29, 2018, with what "appeared to be human bite marks on the right side of her neck." (May 10, 2018 Tr. at 5.) According to a liaison with FCCS, A.R. "would not give information about the marks." (May 10, 2018 Tr. at 5.) An attorney for mother argued that A.R. "is a special needs student" in the fourth grade, and mother and A.S. "reported that she's been repeatedly abused at school." (May 10, 2018 Tr. at 6.) At the conclusion of the hearing, the magistrate ordered temporary custody of A.R. to FCCS.

{¶ 52} Following a hearing on May 17, 2018, the magistrate returned A.R. to her mother under a temporary order of protective supervision. On July 11, 2018, the magistrate found A.R. to be a dependent minor, and granted a temporary order of custody to FCCS based on the failure of mother and A.S. to comply with case plan objectives regarding psychological evaluations.

{¶ 53} On August 2, 2018, the magistrate conducted a dispositional hearing. During the hearing, a caseworker for FCCS indicated the agency "has not identified immediate danger to the child throughout our involvement with this case," but the caseworker expressed concern that "the cooperation of the family has been very challenging at times." (Aug. 2, 2018 Tr. at 22.) The magistrate ordered temporary court commitment of the minor to FCCS and granted M.R. and A.S. weekly visitations with A.R. under the supervision of FCCS.

{¶ 54} On May 8, 2019, the magistrate conducted an annual review hearing, and addressed a request by FCCS to extend temporary custody. At the hearing, the GAL noted

A.R.'s request "to have visits with her grandmother." (May 8, 2019 Tr. at 5.) The magistrate granted the motion to extend temporary custody, noting "the actual goal of the case is to have the child reunified with [mother]," but that "[i]t does sound like we need a little bit more time." (May 8, 2019 Tr. at 8.)

{¶ 55} On August 27, 2019, FCCS filed a motion to review and modify orders, in which the agency argued A.R.'s "therapist recommended that the visitations be suspended as the visits are negatively [a]ffecting [A.R.]." (Aug. 27, 2019 Mot. at 2.)  FCCS requested that "the current order for visitations be reviewed and modified." (Aug. 27, 2019 Mot. at 2.)

{¶ 56} On December 9, 2019, the magistrate conducted an annual review hearing. At the start of that hearing, counsel for FCCS requested a second extension of temporary court commitment, and counsel addressed the issue of visitation.  Noting that "there was a temporary suspension previously," counsel indicated "[t]he agency wants to maintain that until such a time that the child's therapist would recommend to reintegrate those visitations because the child did have[,] to my understanding[,] a lot of concern, anxieties." (Dec. 9, 2019 Tr. at 5.)  During the hearing, Jeff Policoff, a caseworker for FCCS, testified that "[w]e ended up having to temporarily suspend visits recently because during one visit * * * there had been some concerns, some disclosures or allegations, [M.R.] has challenged [A.R.] when the workers had not been looking into the room by writing a note and showing this note to [A.R.]." (Dec. 9, 2019 Tr. at 15.)

{¶ 57} The magistrate inquired during the hearing whether there was "a plan to extend some type of visitation or get the visitation reactivated for these folks because otherwise just extending the TCC is a fallacy because * * * we're gonna (sic) get to that next annual review in March, they're not gonna (sic) have visited.  We're not gonna (sic) have a plan." (Dec. 9, 2019 Tr. at 26.)  The magistrate further observed: "[E]ven if I grant the extension in three months, we're gonna (sic) be doing this again [because] * * * there's not gonna (sic) be any visitation.  So, you're not gonna (sic) wanna (sic) return the child.  So, I can already see that." (Dec. 9, 2019 Tr. at 26-27.)

{¶ 58} Counsel for mother informed the magistrate "my client is requesting that there be some accommodation made for * * * some sort of contact or visitation over the holidays." (Dec. 9, 2019 Tr. at 27-28.)  In response to that request, the magistrate stated: "I will order that the treating counselor make a recommendation whether they believe the

visit * * * can occur supervised in a therapeutic setting. We gotta (sic) do something to try to fix this and if the therapist says they're willing to do it, it can occur in that manner." (Dec. 9, 2019 Tr. at 28.)

{¶ 59} On January 17, 2020, the magistrate conducted a "continued review hearing," and addressed a motion to "restart visitation." (Jan. 17, 2020 Tr. at 2.) Counsel for FCCS informed the magistrate: "[A]s far as the motion to restart visitation, * * * I've talked to the service team who has indicated that the therapist is still saying no therapeutic visits and no family counseling * * * or visits with mom at this time. * * * So, we're asking to just maintain that order, that the visitation only be in therapeutic setting if the therapist thinks it's okay, which they don't believe it is right now." (Jan. 17, 2020 Tr. at 3.) The magistrate extended the temporary custody order and set a new review date.

{¶ 60} On February 25, 2020, FCCS filed its motion for permanent custody. In its memorandum in support, FCCS argued that A.R. was placed in the temporary custody of the agency on July 11, 2018. FCCS further argued "[t]he parent has abandoned the child"; specifically, that M.R. "has failed to visit or have meaningful contact with [A.R.] for a period of time lasting 90 days or more." (Feb. 25, 2020 Mot. for Permanent Custody at 5.)

{¶ 61} On December 14, 2020, the trial judge conducted a status hearing, during which counsel for A.S. addressed his recently filed motion for legal custody. Noting that "mother was denied visitation because of an incident at the agency," counsel for A.S. requested "that my client separately be allowed some kind of supervised visits with [A.R.]." (Dec. 14, 2020 Tr. at 10.) Counsel for mother indicated "my client would be in agreement with visits for [A.S.]." (Dec. 14, 2020 Tr. at 13.)

{¶ 62} In response, the GAL for A.R. voiced "oppos[ition] to [A.S.] having visits with [A.R.]." (Dec. 14, 2020 Tr. at 10.) Further, counsel for A.R. informed the court A.R. "does not want to visit with [A.S.]." (Dec. 14, 2020 Tr. at 12.) At the close of the hearing, upon an inquiry by mother about when she could see her daughter, the court indicated: "[A]t this point in time, I'm denying the request due to the representations of her attorney and the guardian ad litem." (Dec. 14, 2020 Tr. at 32.)

{¶ 63} On September 27, 2021, the juvenile court conducted a hearing during which counsel for mother "request[ed] that the Court order the Agency to provide some sort of therapeutic visitation or some sort of opportunity for visitation * * * to work toward visitation with this child through a therapeutic setting." (Sept. 27, 2021 Tr. at 12.) Counsel

for mother argued such visitation "actually had been ordered back in 2018, but there's no evidence that there was * * * any effort on the Agency's part to start therapeutic visitation." (Sept. 27, 2021 Tr. at 12.)

{¶ 64} In response, counsel for FCCS stated: "Your Honor, I * * * can't speak to something that happened in 2018. I was not on the case at that time. What I can say is that it's my understanding that [A.R.] does not want visits at this time." (Sept. 27, 2021 Tr. at 12-13.) During the hearing, the GAL stated that A.R. "definitely does not want visits, Your Honor, and part of the problem why visits were stopped before was [A.R.] was being made so uncomfortable by the things mother was saying to her at the visits, they had to be interrupted repeatedly to re-direct." (Sept. 27, 2021 Tr. at 13.)

{¶ 65} At the conclusion of the hearing, the trial judge made the following ruling on the record: "My position on these matters particularly with children of [A.R.'s] age that have an established relationship with a clinician or other mental health provider is to leave that in the hands of mental health providers and clinicians as opposed to lawyers in making those determinations." (Sept. 27, 2021 Tr. at 14.) The trial judge then stated: "I think * * * the order should be if at any point between now and the trial date that the clinician indicates that this would be in her best interest to begin that -- not solely just her desires, but her best interest as part of her treatment and work, the Agency shall immediately notify the Guardian Ad Litem and [counsel for A.R.] and therapeutic visits if at all recommended by her mental health provider shall be established forthwith." (Sept. 27, 2021 Tr. at 14.)

{¶ 66} In response to the court's ruling, counsel for A.S. offered that "hopefully" visitation "can happen" for A.S. and mother "even if it's supervised by the therapist or whoever, even if it's for half an hour * * * or an hour once a week." (Sept. 27, 2021 Tr. at 15.)

{¶ 67} As noted under the facts, caseworker Smith testified during the PCC hearing that mother and A.S. had been permitted supervised visitation until August 2019, at which time visitation was suspended. The caseworker further testified that, approximately one week prior to the hearing on the PCC motion, A.R.'s therapist approved a meeting with appellants and A.R. That meeting took place at the agency, with the GAL present.

{¶ 68} In challenging the juvenile court's best-interest findings on appeal, appellants argue the lack of contact and parent/child bond was the primary reason the court found PCC was in A.R.'s best interest. Appellants contend, however, the more than four-

year period of separation between mother and daughter was due to the denial of any visitation, and appellants maintain the evidence failed to show the continued denial of visitation was in A.R.'s best interest.

{¶ 69} In support, appellants rely most heavily on a decision of the Ninth District Court of Appeals, *In re C.S.*, 9th Dist. No. 25344, 2010-Ohio-4463. Under the facts of that case, a child resided with her mother from the time of her birth (in 1996) until 2003, when the mother "sought assistance with child care from members of her family." *Id.* at ¶ 2. In 2008, after a relative was no longer able to care for the minor, the Summit County Children Services Board initiated a case, and a case plan was developed to reunite the mother and child. In 2009, Summit County Children Services Board moved for permanent custody of the child. The juvenile court granted the motion for permanent custody and terminated parental rights.

{¶ 70} On appeal, the mother challenged the juvenile court's best-interest findings, citing "the fact that she was not permitted to have any visitation or other contact with her daughter for nearly eighteen months during this case," and asserting "that this prohibition * * * affected several of the best interest factors that are fundamental to the result * * * and that the evidence, therefore, does not clearly and convincingly weigh in favor of termination." *Id.* at ¶ 9. The Ninth District agreed and reversed, finding the fact the mother and minor "were unable to have even minimal contact for nearly a year and a half has distorted the significance of evidence on the best interest factors, and especially on such key factors as the parent-child relationship and the child's wishes for her own custody." *Id.* at ¶ 10.

{¶ 71} The Ninth District, in addressing the first best-interest factor under R.C. 2151.414(D)(1), noted "[t]he key relationship issue in this case * * * is the relationship or the potential relationship between Mother and child, and how that has been affected by the lack of any contact between them for nearly eighteen months." *Id.* at ¶ 22. The court then reviewed the "procedural facts regarding the visitation issue," noting the original case plan provided for supervised visitation between mother and child for one hour weekly. *Id.* at ¶ 23. Under an amended case plan, the child's counselor "apparently * * * determined that it would not be in [the child's] best interest to have visits with Mother unless and until Mother first had three therapy sessions with her." *Id.* at ¶ 24. The counselor was "concerned that there was a history of abuse between Mother and daughter and that Mother

made 'empty promises' of reunification." *Id.* at ¶ 25. The reviewing court found the reasons given by the counselor did "not support the complete denial of visitation," and the court further observed: "Given that the goal of this case was reported to be reunification and the original case plan provided for weekly visitation, visitation was a critical component of the process." *Id.* at ¶ 34-35.

**{¶ 72}** Addressing more broadly the issue of lack of visitation in the context of the goal of the case plan for reunification, the court held in part:

> This Court has recently stated that visitation, properly supervised and carefully graduated, permits the parties in such custody cases to safely work towards the statutorily mandated goal of reunifying families whenever possible. * * * Indeed, it has been recognized that a complete lack of visitation between parents and their children can "alienate children and break familial bonds." * * * "Until permanent custody is granted by the court, visitations should not be prematurely curtailed, unless it can be shown that the child will truly be harmed by the visitation." * * * When there has been a lack of contact over an extended period of time, there is a risk that children's perceptions can change and children can lose a previously held desire to see their parents.

*C.S.* at ¶ 34.

**{¶ 73}** In analyzing the first best-interest factor in light of the procedural history of the case, the Ninth District held: "Where there has been no visitation between a parent and child for nearly eighteen months, despite visitation being a part of the court-ordered case plan and being desired by the parent and child, evidence of their relationship is distorted and cannot be meaningfully measured." *Id.* at ¶ 44.

**{¶ 74}** As to the second best-interest factor, the Ninth District noted testimony by the GAL that "she believes [the child] would like to live with an adoptive family, but still visit with Mother." *Id.* at ¶ 47. On appeal, the mother argued that "[g]iven the lack of contact between them," the child's wishes "should not be given much weight." *Id.* at ¶ 49. The reviewing court, observing that "a deprivation of contact by a child with a parent can lead the child to forego a previous desire to maintain that relationship," held: "Where there has been no contact between [the] Mother and [the] child for nearly eighteen months, the evidence regarding the wishes of the child, much like the evidence of their relationship, is distorted and cannot be said to be clear and convincing." *Id.*

**{¶ 75}** Although declining to decide that the mother should have custody of her daughter, the Ninth District held that the agency had "not met its burden of clearly and convincingly establishing that mother's parental rights should be terminated," and that "[t]he denial of visitation and the delays of the court system eliminated any realistic chance of reunification." *Id.* at ¶ 51. Further, while acknowledging the mother "may or may not have been successful" had visitation "been permitted," the court observed there at least "would have been a reasoned basis for a finding as to their relationship and the child's wishes," and that there existed "an opportunity to remove some of the uncertainty by providing visitation in a supervised, protected environment." *Id.*

**{¶ 76}** In the present case, appellants assert that, analogous to the facts of *C.S.*, the denial of visitation was unfair to mother and distorted the evidence relied on by the court in weighing the first, second and third best-interest factors. In response, FCCS contends there are "effective differences between the *C.S.* case and the case at bar," arguing that the therapist in *C.S.* "decided unilaterally that the mother should attend sessions before a visit was allowed," and further asserting the therapist and caseworker in the case before us "encouraged and tried to get [A.R.] to visit Appellant M.R." (FCCS's Brief at 36.)

**{¶ 77}** Despite some differences between the facts and circumstances of *C.S.* and the present case, we find the similarities more compelling than the differences. Further, we find persuasive the Ninth District's analysis as to the "significance of evidence on the best interest factors" where (and under circumstances strikingly similar to the facts presented in this case) there has been a lengthy lack of contact between the child and parent. *C.S.* at ¶ 10.

**{¶ 78}** As outlined above, the procedural history of the present case reflects that visitation with M.R. and A.S. was suspended in August 2019, resulting in no visitation between M.R. and A.R. for a period of more than four years. The record also indicates that, throughout the relevant time period, mother and A.S. sought to resume visitation. The juvenile court recognized such fact, noting in its decision: "To be clear, Mother and [A.S.] have consistently and on an ongoing basis requested that regular visitations resume with [A.R.] and throughout the greater portion of this case there were interim orders allowing for visitations to occur so long as sanctioned/recommended by [A.R.'s] counselor, Melissa Saunders." (Oct. 11, 2023 Decision at 5.)

{¶ 79} A review of the various relevant hearings reflects that A.R. expressed to the GAL she did not wish to resume visits, and that the counselor apparently did not sanction any visitation with the exception of one meeting shortly (i.e., approximately one week) before the PCC hearing. While, as noted above, FCCS contends the therapist encouraged A.R. to visit M.R., the record simply does not reflect whether or not that occurred. We note A.R.'s counselor/therapist did not testify during the PCC hearing, nor were any clinical reports introduced into evidence indicating a basis as to why the therapist apparently did not recommend or approve any visitation (even in a supervised, therapeutic setting) for such a lengthy period of time.

{¶ 80} The significance as to M.R.'s lack of opportunity to visit with A.R. over such a protracted period was the subject of testimony by both the caseworker and GAL during the PCC hearing. The caseworker, when questioned about the interaction between M.R. and A.R., expressed her own "concern" that M.R. and A.R. "have only seen each other twice since 2019 and they're not familiar with each other anymore and they would have to learn each other again." (Oct. 3, 2023 Tr. at 40.)

{¶ 81} The current GAL testified that, after she became involved in the case, "there was a change" in a previous court order "that would allow parents to have visits if * * * her current counselor thought it would be beneficial to her and if [A.R.] requested it." (Oct. 3, 2023 Tr. at 147.) The GAL acknowledged that "[a]fter that * * * I started to explore whether or not [A.R.] would want those sorts of visits because I too found it somewhat problematic that there had been no attempt at all for any kind of contact, any kind of progress in that direction either therapeutically or any other way." (Oct. 3, 2023 Tr. at 147.) The GAL stated that A.R. "was adamant at that time that she did not want visits set up except to tell * * * [M.R.] and [A.S.] what her wishes were." (Oct. 3, 2023 Tr. at 147.)

{¶ 82} The GAL further acknowledged that A.R. "has just been out of the home for so long now and I do think it's unfortunate that things didn't happen in a quicker period of time and some of this was through no fault of [M.R.] and [A.S.] that five years have gone by since this case was filed." (Oct. 3, 2023 Tr. at 154.) According to the GAL, "it has just gone on for a very long time and the longer it goes on, the older [A.R.] gets, the more used to the situation she's currently in and the less inclined she is to want to go back into the previous home that she knew." (Oct. 3, 2023 Tr. at 154.)

**{¶ 83}** The above testimony of the GAL echoes the same concerns of the Ninth District in *C.S.*, i.e., the recognition that "a complete lack of visitation between parents and their children can 'alienate children and break familial bonds,' "and that "[w]hen there has been a lack of contact over an extended period of time, there is a risk that children's perceptions can change and children can lose a previously held desire to see their parents." (Citation omitted.) *C.S.* at ¶ 34. *See also In re Jeffrey S.*, 6th Dist. No. L-96-178 (Dec. 18, 1998) ("It does not require expert testimony to understand that no visitation or contact with parents serves to alienate children and break familial bonds, especially where * * * the time between the last visit and final determination of custody is unreasonably long.").

**{¶ 84}** Here, despite M.R.'s desire to resume visitation with A.R., the record establishes M.R. had no contact with A.R. for more than four years after visitation was suspended in 2019. During that time, the evidence indicates (as found by the juvenile court) "both [M.R.] and [A.S.] substantially and timely completed the case plan objectives identified for each of them," and both M.R. and A.S. "consistently and on an ongoing basis requested that regular visitations resume with [A.R.]." (Oct. 11, 2023 Decision at 5.) While, as previously noted, there was evidence that A.R. expressed her desire not to visit M.R., the record is at best equivocal as to efforts made by the agency or the therapist to facilitate family counseling or visitation (which, in any event, did not occur), and the record is simply lacking as to the extent to which the therapist may have actually encouraged A.R. to participate in visitation with M.R. (or sought to resolve visitation issues). As also noted, in the absence of testimony by the therapist and/or other clinical evidence, the basis for the therapist's apparent reluctance to recommend any visitation, even in a therapeutic setting, is less than clear.

**{¶ 85}** In considering the best-interest factors, the juvenile court made findings that A.R. "no longer has a parent-child bond with [M.R.]," and that A.R. "personally told [M.R.] * * * she did not want to return home and wishes to be adopted just days before the start of this trial." (Oct. 11, 2023 Decision at 7, 9.) Despite the juvenile court's recognition that M.R. "consistently" requested the resumption of regular visitation, the court's application of the best-interest factors does not directly address the potential adverse impact on the parent-child relationship resulting from the lack of visitation over such an extended period of time, i.e., the context in which M.R.'s lengthy absence from A.R.'s life may have affected the parent-child bond and the wishes of the child.

**{¶ 86}** We find persuasive the Ninth District's reasoning in *C.S.* that, where there has been "no visitation between a parent and child" for a lengthy period of time, evidence as to the relationship between the parent and child, as well as evidence regarding the wishes of the child, "is distorted and cannot be meaningfully measured." *C.S.* at ¶ 44. As observed by the court in that case, while the mother "may or may not have been successful" had visitation been permitted, there would at least "have been a reasoned basis for a finding as to their relationship and the child's wishes." *Id.* at ¶ 51.

**{¶ 87}** Applying that analysis to the facts and circumstances of this case, we conclude the lack of visitation for more than four years (a period of time more extensive than the 18-month period at issue in *C.S.*) "has distorted the significance of evidence on the best interest factors," especially on the "key factors" with respect to "the parent-child relationship and the child's wishes for her own custody." *Id.* at ¶ 10. Further, and "[r]egardless of the reasons for the lack of visitation," the result is that M.R. and A.R. "did not have a meaningful process by which the question of permanent custody could be determined." *Id.* at ¶ 55.

**{¶ 88}** Upon review, we are unable to conclude the record contains clear and convincing evidence that terminating mother's parental rights and granting FCCS's motion for permanent custody is in the best interest of the child at this time. Accordingly, we find merit with appellants' argument that the weight of the evidence does not support the judgment of the juvenile court.

**{¶ 89}** Finally, as in *C.S.*, we make clear that we "do not suggest" the mother should gain custody of the child at this time. *Id.* at ¶ 10. We note, at the time of the PCC hearing (on October 3, 2023), A.R. was 15 and one-half years of age, and was therefore not eligible for a planned permanent living arrangement ("PPLA"). During that hearing, counsel for M.R. cited the fact that A.R. was "close to a PPLA," and counsel argued "[t]here's a lot of other options that are out there short of a death penalty," and further argued "the Court does have the option to continue this [until] we can get a PPLA in place." (Oct. 3, 2023 Tr. at 170.) While the option of a PPLA may or may not be viable depending on other factors, we take notice of the fact A.R., for purposes of consideration of such a placement, is currently 16 years of age. *See* R.C. 2151.353(A)(5) (providing for PPLA under certain circumstances, including requirement "that the child is sixteen years of age or older").

{¶ 90} Based on the foregoing, appellants' second assignments of error are sustained.

{¶ 91} Under appellants' first assignments of error, appellants contend the juvenile court committed plain error in terminating the parental rights of M.R. where M.R. was denied an opportunity to visit and reunite with A.R. In light our disposition of appellants' second assignments of error, finding the weight of the evidence does not support the juvenile court's termination of M.R.'s parental rights and the grant of permanent custody to FCCS, the arguments raised under appellants' first assignments of error are rendered moot.

## IV. Conclusion

{¶ 92} Based on the foregoing, appellants' second assignments of error of are sustained, appellants' first assignments of error are rendered moot, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is reversed, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed; cause remanded.*

JAMISON, J., concurs.
MENTEL, P.J., dissents.

MENTEL, P.J., dissenting.

{¶ 93} Because *In re C.S.*, 9th Dist. No. 25344, 2010-Ohio-4463 is distinguishable to the point it should not dictate the outcome here, and the trial court's decision to grant FCCS permanent custody of A.R. is supported by the manifest weight of the evidence in this case, I respectfully dissent.

{¶ 94} *In re C.S.* recognizes an agency may cease visitations if they can show the child will be harmed by the visitations and sets forth a case-by-case analysis focused on the validity of the reasons behind the counselor's decision to deny visitations. *Id.* at ¶ 34-36. The *In re C.S.* court determined PCC was inappropriate after determining the child's counselor's reasons for denying visitations were deficient, which unnecessarily prevented the mother and child from bonding and thereby polluted the trial court's analysis of the best interest factors in R.C. 2151.414(D)(1).

{¶ 95} However, the reasoning and outcome of *In re C.S.* was driven by underlying facts fundamentally distinct from the instant case. There, the preliminary visits between

the mother and child went well, the mother generally behaved appropriately, the child was "very adamant" in wanting to continue the visits, and the counselor's denial of visitation seemed to be based on the foregone conclusion that the mother would not gain custody as well as information outside of the record. *Id.* at ¶ 33. Unlike *In re C.S.*, in this case, the record shows that visitations between A.R. and M.R. and A.S. ceased due to A.R.'s negative emotional and psychological reaction to the visitations and expressed desire to not see her mother.

{¶ 96} In my view, the disparate reasoning underpinning the visitation issue in these two cases is a distinction significant enough to refrain from applying *In re C.S.* here. Holding otherwise could imply FCCS must press children to attend visitations that negatively affect their emotional and psychological well-being or risk suspending—or losing—the opportunity to resolve custody in the children's best interest.

{¶ 97} Moreover, because the majority decision focuses, nearly entirely, on the visitation issue from the mother's perspective, it discounts evidence informing the ultimate question this court must decide: what is in A.R.'s best interest?

{¶ 98} "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 20. *See In re Cunningham*, 59 Ohio St.2d 100, 106 (1979) (A parent's natural rights are "always subject to the ultimate welfare of the child.").

{¶ 99} Here, the record shows that: A.R. is undergoing counseling to deal with past trauma and has special needs that her foster family, who she is bonded to, understands and is equipped to assist her with; that A.R. is in a school with a good program for children and adolescents with IEPs; M.R. has called A.R. a liar, is defensive and angry in response to A.R.'s concerns, and has a pattern of promising A.R. gifts to return home; M.R. and A.S. sold their home, were living in an extended stay facility, and were going to—imminently—move to West Virginia; A.R. expressed—adamantly, to the caseworker, the GAL, and the trial court judge—her desire to not return to M.R. and A.S.; one of the trial court's most experienced and trusted GALs believed granting the PCC motion is in A.R.'s best interest based both on A.R.'s wishes and the GAL's concerns with M.R.'s ability to be a parent; and A.R. did not want to visit with M.R. or A.S. except to tell them prior to these proceedings of her desire to not return to them. The trial court, in making its decision to grant FCCS

permanent custody, did consider M.R. and A.S.'s consistent requests for visitations and the reasons those visitations nevertheless did not occur, which I believe was the appropriate way to assess visitation in this case. *See In re C.D.*, 10th Dist. No. 22AP-649, 2024-Ohio-446, ¶ 13 (assessing children's reluctance and refusal to visit with family as an indication they do not have a strong, healthy bond with those family members under R.C. 2151.414(D)(1)(a) to support finding PCC to FCCS for purposes of adoption to be in the children's best interest).

{¶ 100} Contrary to the majority decision at ¶ 87-88, I believe this record is sufficiently clear and convincing to support the trial court's best interests of the child determination. With our standard of review in mind, in which the Supreme Court of Ohio in *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 13-14 recently reminded appellate courts to "be mindful of the presumption in favor of the finder of fact" when weighing the evidence, I would find the trial court's decision to grant FCCS permanent custody of A.R. is supported by the manifest weight of the evidence in this case, and therefore believe the trial court's judgment should be affirmed. Because the majority decision holds otherwise, I dissent.

———————————